**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John D. CLARDY, Defendant-Appellant.**

No. 78–2373.

United States Court of Appeals,
Ninth Circuit.

Jan. 7, 1980.

Rehearing Denied Feb. 19, 1980.

Nancy L. Simpson, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Jerome B. Falk, Jr., San Francisco, Cal., for defendant-appellant.

Before CHOY and ANDERSON, Circuit Judges, and WYATT,* District Judge.

WYATT, District Judge:

John D. Clardy appeals from a judgment of conviction in the United States District Court for the Northern District of California on three counts of an indictment charging him with three separate violations of 26 U.S.C. § 7206(2). That section, in relevant part, makes it an offense if any person "[w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under . . . the internal rev-enue laws, of a return . . . which is fraudulent or is false as to any material matter . . . ." A jury found Clardy guilty on each of the three counts after a trial before Honorable William H. Orrick, District Judge.

The three counts charged that Clardy aided, assisted, etc. in the preparation and presentation of income tax returns for the year 1971 by three dentists and their respective wives. Each count charged that the return was false and fraudulent in that it represented that the taxpayers were entitled to a prepaid interest expense deduction whereas Clardy knew that they were not so entitled. The first count involved the return of Don C. and Elizabeth Ann Johnson; the second count involved the return of Delmar R. and Diane Mobley; and the third count involved the return of Morgan J. and Helen J. Ririe.

The trial took place for eight days in April 1978. Judge Orrick instructed the jury late in the afternoon of April 13, but directed that deliberation begin the next morning at 9:30. The jury followed such direction and, without the necessity of any further instructions, returned its verdict shortly before two o'clock on April 14, 1978.

After the verdict, counsel for Clardy moved to set aside the verdict and for judgment of acquittal (Fed.R.Crim.P. 29(c)) or for a new trial (Fed.R.Crim.P. 33). The motion was heard and denied by Judge Orrick, without opinion.

The sentence was imposed on June 15, 1978. On each count there was a fine of $3,000 and commitment for three years, with confinement to be for six months and execution of the remainder of the sentence as to imprisonment suspended and Clardy placed on probation. The sentences as to confinement were to run concurrently. The fines were separate and in total $9,000.

This appeal followed. Clardy has been free pending appeal.

We affirm the judgment of conviction in all respects.

---

* Honorable Inzer B. Wyatt, United States District Judge, Southern District of New York, sitting by designation.

On the evidence of record and "taking the view most favorable to the Government", as we are required to do (*Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)), the verdict of the jury was amply justified, if not compelled. The jury could have found the facts to have been as now summarized.

### 1.

Clardy was a business man in Santa Rosa, Sonoma County, some fifty miles north of San Francisco. He was the sole owner of a corporation called Capital Three or Capital 3 which did business under the name "Clardy and Associates" or "Clardy Associates" (for short, hereafter "Associates").

Clardy was also the dominant figure in a corporation called Equity Properties, Inc. (EPI), organized in 1971 and in which he had somewhat in excess of 10% of the capital stock. Nine other individuals held the rest of the stock of EPI; these included Johnson, involved in count one, and Mobley, involved in count two. Clardy was President and General Manager and a director of EPI. Associates was the business manager of EPI; the people who were active in the day to day affairs of the two corporations were paid by Associates which in turn was paid by EPI for services performed.

Associates and EPI were in the business of buying and selling real estate and supplying business and advisory services to clients of EPI, some of whom were stockholders of EPI and some were not. A principal activity and preoccupation of EPI, Associates and Clardy was minimizing the income taxes of clients. A report by Clardy to EPI for the period ending August 1, 1971, stated that EPI had "delivered an average tax savings of 79% to our clients" and referred to the EPI "tax avoidance program". An investment plan for a client listed as one of its goals the "transfer of capital from stock to real estate without diluting capital through payment of taxes." A knowledgeable witness described Clardy's business as "tax shelters".

Clardy, Associates and EPI all had the same offices.

Clardy himself knew everything of any importance in the affairs of Associates, EPI, and their clients. Nothing of any significance was done without his knowledge and approval. During their investigation, he told the IRS agents in substance that he was the boss and if anything was wrong he had the blame.

EPI clients paid to EPI as fees 10% of their gross professional and rental receipts. As part of its services performed, EPI kept books and records for its clients (these included Johnson and Mobley) showing all their income and disbursements; preparation of their tax returns was also arranged by EPI. Receipts for EPI clients from rentals or other real estate transactions came directly to EPI, which also made disbursements for clients. These receipts and disbursements were recorded on "master control cards" maintained in the Clardy offices, one for each client. The credit balances in favor of clients were deposited in a commingled trust account at Wells Fargo Bank in Santa Rosa.

Delos Smith was a certified public accountant, having his own office separate and apart from Clardy's. He was "consulting accountant" to EPI, on a contract retainer agreement under which he was paid by Clardy or by Associates. Smith prepared the tax returns for all EPI stockholders and for EPI clients whenever he was asked by Clardy to do so. He was paid $200 for each return prepared; all he did was to take the material provided by Clardy's office and put it on the return. Smith passed on the hiring of bookkeepers for Clardy and supervised the bookkeeping and accounting done in the Clardy offices. He was in and out of those offices frequently and attended the meetings of directors of EPI.

Associates had two separate bank accounts at Wells Fargo: (a) 536 13030 and (b) 536 13022. The 13030 account was referred to as the "trust account" and consisted of the total of the credit balances of the separate individual clients of EPI, commingled without any indication from the bank records as to how much belonged to each client. To determine the interest in the

bank account balance of each client, it was necessary to resort to the master control card in Clardy's office. The 13022 account was an ordinary checking account in which funds belonging to Associates were deposited and from which they were disbursed.

EPI had its own bank account at Wells Fargo, numbered 536 15563.

Clardy and his companies were good customers of the branch at Santa Rosa of Wells Fargo, whose manager, Valley, extended special favors to them because, as he testified, "the corporations were borrowing customers of the branch."

2.

Desborough, who lives in Los Angeles, in December 1968 bought 111 acres in western Sonoma County known as Green Valley Ranch. The purchase price was $120,500. The land was vacant, no houses, only a very old barn. His plan was to develop a trailer recreational park there, but after a losing struggle to secure a permit, he had to give up his plan. Toward the end of 1970, he asked Clardy to sell the Ranch for him. He turned to Clardy because Clardy had represented the seller when he bought the property.

In 1971, while Clardy was trying to sell the Ranch, Desborough became a client of Clardy and of EPI.

Desborough had organized Cougar Construction Company, wholly owned by him, to do the construction needed for the proposed trailer park. When this plan failed he kept Cougar alive but inactive because Clardy thought it would be useful as a means of handling some transactions.

Under date of December 2, 1971, Desborough transferred the Ranch to Cougar. This was preliminary to a pretended sale to Johnson and the use of Cougar was suggested by Clardy as a means of reducing the federal tax liability of Desborough. The transfer to Cougar was at cost to Desborough less depreciation, the transfer figure apparently having been $106,449. Clardy told him that if he deeded the Ranch to Cougar he would not incur any personal tax liability in 1971.

Under date of December 2, 1971, Dr. Johnson and his wife signed an agreement to buy the Ranch for $650,000 or $5856 per acre. This agreement provided that the first year's interest of $65,000 would be paid in advance. The proposed purchase was never serious nor in good faith; it was simply part of a paper facade, erected by Clardy with the connivance of others, to secure a prepaid interest deduction on Johnson's tax return. Johnson did not discuss the price of the Ranch with Clardy nor with anybody else. He testified that he merely took Clardy's word that the price was fair; that he had no appraisal made; and that he did not know that Desborough had paid $120,500 for the property in 1968 and had just transferred it to Cougar at his depreciated cost of $106,449. Johnson had a relatively small net worth; he had only equities in real estate, of uncertain but modest value. He had no cash. He talked to no banks and did not know where the $650,000 was coming from; the financing and everything else was left to Clardy, who himself had stated in his EPI 1970–1971 Annual Report that land prices in the area "have fallen to an all time low over the past 12 months" and that land could be acquired "prime for development at prices less than 40% below those charged in 1965."

Under date of December 2, 1971, Johnson executed an "installment note" for $65,000 to Cougar, to be paid $790 on the fifteenth of each month beginning January 15, 1972. This was to secure a "loan" from Cougar of the amount of the interest planned to be prepaid in 1971.

Clardy also caused Johnson to execute, under date of December 2, 1971, a deed of trust covering the already mentioned equities in real estate. The deed of trust was to secure the $65,000 "loan" from Cougar to Johnson for his prepayment of interest to Cougar. According to Johnson: "They wanted to take my equities as security— they were the only people who would do it." The deed of trust was acknowledged on December 6, 1971, and recorded on December 29, 1971.

Clardy sent the December 2, 1971, Johnson-Cougar purchase agreement by mail to Desborough in Los Angeles for signature. Desborough did not know the Johnsons nor anything about them. There was no explanation to Desborough but he signed the agreement anyway as President of Cougar. Nothing about the transaction was taken seriously on either side and the agreement was never recorded.

Clardy now arranged a series of book entries, checks, and a bank deposit designed to show the payment of $65,000 in prepaid interest by Johnson to Cougar. This of necessity had to be a sham transaction because Johnson did not have the money to pay the $65,000 and, while a loan from Cougar to pay the interest was pretended, Cougar had no money to lend Johnson for this or any other purpose. Johnson had a credit balance at Associates of $252.66 in the trust bank account and Cougar had nothing to its credit in that account.

Clardy drew two checks dated December 6, 1971 on the Associates trust bank account (13030). One was a check for $65,000, signed by him payable to "Clardy Associates Trust Account for Cougar Const." On the check was the legend: "Johnson—Prepaid interest on Green Valley Road Contract." The other was a check for $65,000, signed also by Clardy, payable to "Clardy Associates Trust Account (for Johnson)". On this check was the legend: "Loan from Cougar Construction".

In a normal good faith transaction, these checks would have been made payable to Johnson and Cougar, and by them deposited in their own respective separate bank accounts. Instead, Clardy caused them to be made payable as described and to be deposited simultaneously on December 7, 1971, in the very bank account on which they were drawn—the trust account of Associates. This maneuver was the only way the checks could clear the bank, because if handled normally, the checks would have been dishonored by Wells Fargo. This would have been inevitable because the trust bank account (13030) did not itself have a credit balance on December 7, 1971

of $130,000, nor even $65,000. The balance at the close on December 6, 1971 was $28,260; indeed, the bank account during the whole month of December, 1971, did not at any time have a credit balance of as much as $45,000.

When the checks were deposited on December 7, the bank, probably by arrangement with, and to accommodate, Clardy, first gave a credit to the trust bank account of $130,000. This seems to have been a dubious banking practice, to say the least— to credit to a bank account checks drawn on that same account. Even Valley, defensive of his bank as well as of Clardy, had to admit that it was "unusual" and "done for bookkeeping and documentation purposes". In any event, the bank followed the credit entry with two debit entries of $65,000 each, representing the same two checks drawn by Clardy. Thus, there was one credit entry and two debit entries on the same date, cancelling each other out in a "wash" transaction. Nothing of substance transpired; the credit balance in the trust bank account remained precisely the same after the "deposit" of the checks as before. The balances of Johnson and Cougar in that account remained precisely the same— $252.66 for Johnson and zero for Cougar.

The paper record of the $65,000 prepaid interest had now to be completed by appropriate entries on the master control cards kept by Clardy for Cougar and Johnson. These cards are designed for entries to be made on lines from top to bottom chronologically.

On the card for Cougar, just before December 6, 1971, the credit balance of Cougar on the last line down in which entries appeared was shown as zero. It was necessary, therefore, to show the prepayment of the interest before the loan from Cougar in order to give Cougar a credit balance from which to make the loan. This was done. The credit entry on December 6 was "Prepaid Int. Green Valley Rd. Contract $65,000". This gave a credit balance of $65,000. The next entry was a debit: "Loan to Johnson $65,000". This wiped out the credit balance of Cougar, leaving it zero as before.

On the card for Johnson, the necessities of the situation compelled entries inconsistent with those made on the Cougar card. Since Johnson's card showed a credit balance before December 6 of only $252.66, it was necessary to show his receipt of a loan from Cougar *before* his prepayment of interest in order to give him a credit balance from which to prepay the interest to Cougar. This was done. The credit entry on December 6 was "Loan from Cougar $65,-000". Then the *next* entry on December 6 is a debit: "Prepaid int. on Green Valley contract $65,000", thus reducing the credit balance of Johnson to $252.66 as before.

The sham character of the interest prepayment is disclosed by the entries just described. On the card of Cougar, the lender, the prepayment of interest must be shown as having been received before the loan in order to create a credit balance against which a loan to Johnson can be debited to enable him to prepay the interest.

There is nothing in this but an illusion. The prepayment of the $65,000 interest was not with any money nor with any bankable funds. It was accomplished, as the government accurately stated, by check swapping. It may be noted that, since no financial resources are required, there is no limit to the amount which can be "paid" by this technique; $650,000 is as easily "paid" as $65,000.

The drawing of the checks, their deposit and the other details of the transaction would not appear from their testimony to have been known by Johnson or by Desborough. No loan to Johnson by Cougar was ever authorized by Desborough nor was he ever asked to do so. He never saw the checks nor any of the records made nor any of the book entries. Johnson never saw the checks and does not remember whether he knew at the time anything about any loan by Cougar; he did not know whether Cougar had $65,000 to lend him and testified: "It wasn't important to me, one way or the other." Johnson, whether consciously or not, showed his understanding of the prepaid interest "payment" when he also testi-

fied: "But it's incidental, because it's really a bookkeeping entry—it's really a bookkeeping transaction."

Johnson was supposed to pay $790 on January 15, 1972, on his note to Cougar for $65,000 and $790 on the fifteenth of each succeeding month. He testified that he made the first two payments of $790 each, these having been due on January 15, 1972, and February 15, 1972, respectively.

The tax year 1971 having ended, by February 11, 1972, Clardy had decided that it would soon be time to reverse the Green Valley Ranch sale to Johnson. He had also devised a cover story for the reversal. He recorded the reversal plan on February 11, 1972, as follows:

> By agreement with Desborough, we will rescind the Green Valley Rd. transaction at no cost to Johnson. This will be done on the basis that due to the inability to get sufficient water Don was unintentionally mislead to believe that the property would meet his needs for a grape ranch and wine tasting room operation. We will treat the 1971 deduction of $65,-000.00 as ordinary income for 1972. The note against his property will be forgiven and all monies refunded.

Twenty acres of the Green Valley Ranch, since as early as January 1971, had been offered for sale through newspaper advertising and through real estate brokers other than Clardy. The other brokers were told that everything was to be cleared with Clardy. Despite the pretended sale of these 20 acres (and all other acres in Green Valley Ranch) to Johnson by the agreement dated December 2, 1971, the offer of these 20 acres for sale was never withdrawn and at least this part of the Green Valley Ranch continued to be shown. Tombe Realty of Sebastopol produced a buyer for the 20 acres. Brown, the buyer, on Friday, February 25, 1972, signed a contract to buy the 20 acres for $35,000 ($1,750 per acre), which was the price at which it had been listed. This contract was then taken to Clardy on February 28 and left with him to secure Desborough's signature. Tombe went back to Clardy on March 1 and picked up the

contract of sale which had been signed by Desborough under date of February 29. In May 1972 the 20 acres were in fact deeded to Brown. As further evidence of the fraudulent character of the Johnson-Clardy-Desborough-Cougar sale to Johnson, it may be noted that while the 111 acres were under contract to be sold to Johnson for $5,856 per acre, 20 of the same acres were sold to Brown for $1,750 per acre. Desborough in his testimony was unable to give any explanation; he said he simply relied on the "judgment" of Clardy.

On March 28, 1972, Clardy gave instructions to reverse the entries on the Cougar-Johnson pretended sale transaction. This was to be done without any cost to Johnson.

Under date of March 29, 1972, reversing entries for the $65,000 prepaid interest were placed on the Cougar master control card in Clardy's office. These entries are difficult to decipher but one of them is a charge described as "Refund prepaid int. on contract of sale which was cancelled". There is a note for $1,580, dated March 29, 1972, signed for Cougar by Desborough payable to Johnson and his wife. There is an "authorization for reconveyance" dated March 29, 1972, signed for Cougar by Desborough. This is an authorization to reconvey to Johnson the equities which had been covered by the deed of trust dated December 2, 1971, acknowledged by Johnson on December 6, 1971, and recorded on December 29, 1971. Whether tidy in all respects or not, Clardy created a paper record as of March 29, 1972, showing the cancellation of the sale of Green Valley Ranch to Johnson and the reversal of the book entries relating to it.

It may be noted at this point that the reason for the cancellation was entirely fictitious. The reason given, as seen from Clardy's February 11, 1972, memorandum, was that Johnson wanted to use the Ranch for a vineyard and wine tasting room but had discovered that there was not enough water for this purpose. The contract, of course, provided no right to cancel for any such cause and certainly had the contract been a genuine one the seller would not have given up an opportunity to sell for $5,856 per acre land which he otherwise could sell for only $1,750 per acre.

Johnson testified to support the reason given but the jury evidently did not believe him. According to his testimony, Clardy presented the purchase as an opportunity to develop the 111 acres "into a vineyard and wine tasting room"; that having completed such a development at a total cost of $1,200,000, the Ranch could then be sold or leased for a profit to him of $200,000; that he learned from Clardy in February or March 1972 that there was not enough water; and that for lack of water he had to cancel the contract. He recognized that there was no cancellation clause in the contract and he was unable to explain why Cougar would agree to cancel merely on request. Johnson had made a sworn statement in September 1974 to an Internal Revenue Agent. The statement, extending over some 46 pages, was to explain the Green Valley Ranch purchase and his prepaid interest deduction. No mention was made by Johnson in that long statement of any plan to develop the Ranch as a vineyard and wine tasting room.

The Ranch land is not in fact suitable for growing grapes and the vineyard idea was never mentioned in any writing until the February 11, 1972, memorandum of Clardy concocting a story to explain the reversal of the purchase of the Ranch as a $650,000 investment so soon after Johnson had agreed to pay that amount for it. Desborough testified that he had never considered the Ranch land suitable for vineyards and that Clardy had never suggested using it for vineyards. There was other evidence which the jury could have accepted that there were no vineyards in the area of the Ranch; that the soil of the Ranch was too sandy to grow grapes; that banks would not lend money on vineyard land until water tests, soil tests, and the like, established feasibility and even then at only some ⅔ of the value; and that no vineyard feasibility study had ever been done on the Ranch.

Although the vineyard-water shortage excuse had been invented in February 1972 and although the reversal of the Johnson purchase had already been documented in March 1972, Clardy applied himself to supporting the excuse by something in writing. He telephoned a well driller friend in April 1972 and obtained a letter dated April 6 expressing "doubt that an ample supply of water could be developed to properly operate a system in that area".

The income tax return for Johnson for 1971 was now prepared.

For some ten years and until November 1971, Johnson had had as his accountant Heller, who prepared his tax returns, including the return for 1970. Under date of November 11, 1971, Associates advised Johnson that for 1972 their charge would be 10% of his "gross income" and that their services for such fee would include "accounting services for all your affairs, including your tax returns". Partly for this reason and doubtless partly to secure the planned prepaid interest deduction, Johnson decided to have Clardy arrange for preparation of his 1971 tax return.

Clardy had already discussed with Smith the deductibility of prepaid interest. Clardy asked Smith to prepare the Johnson 1971 return and Smith did so, obtaining from Clardy's office the information put on the return. When prepared, Smith signed it as preparer and delivered the return to Clardy's office. Smith did not discuss the return with Johnson and testified that he was not sure he had ever met Johnson.

Clardy delivered the return to Johnson who with his wife signed it on June 12, 1972; it was filed with the Internal Revenue Service on June 14, 1972.

On a schedule to the return there is a deduction for "interest" of $68,468.07. While not indicated on the return, this amount (as the investigating Internal Revenue agents soon learned) represented principally the $65,000 which was shown by the December 6, 1971 checks "deposited" by Clardy. The deduction was taken even though, when the return was prepared and filed, the transaction—whatever its charac-ter—had already been reversed. As a result of the prepaid interest deduction, Johnson, who reported gross receipts from his profession in 1971 of more than $180,000 and net profit from his profession of more than $68,000, paid no federal income taxes for that year.

3.

As to the 1971 federal income tax returns of Mobley and Ririe, they each contained a deduction for prepaid interest, $30,000 on the return of Mobley and $16,020 on the return of Ririe. It is not necessary to review the evidence as to them in detail because it is substantially similar to that relating to Johnson. They each purported to buy real estate from EPI on December 27, 1971 and agreed to pay one year's interest in advance. The transactions or purported transactions were cancelled and reversed after the end of tax year 1971. Smith prepared the tax return for Mobley with a $30,000 deduction for prepaid interest as a result of which Mobley, who reported gross receipts from his profession in 1971 of more than $88,000 and net profit from his profession of more than $54,000, paid no federal income taxes for that year. The return for Ririe was prepared by a certified public accountant, independent of Clardy and of Smith. The outside accountant was told by Ririe that $16,020 had been paid in December 1971 as prepaid interest but it was not explained for what it was paid or how it was paid. As Ririe's accountant testified: "He assured me that he had paid it, and as far as I was concerned, that took care of my questions." As a result of the $16,020 prepaid interest deduction, Ririe, who reported gross receipts from his profession in 1971 of more than $100,000 and net profit from his profession of more than $34,000, paid $294 as federal income tax for that year.

Since (as with Johnson) the critical question is whether the interest was "paid" by Mobley and Ririe, it may be well to state how the claimed payments were accomplished.

4.

The pretended payment of prepaid interest by Mobley involved more checks and

more bank accounts than in the case of Johnson, but the accounts are all at the same Wells Fargo Branch, the checks all circle on the same day, December 30, 1971, and no money nor bankable funds are employed (or even available); the sham is equally apparent.

The three bank accounts are (1) Associates trust account (13030), (2) Associates ordinary non-trust account (13022), and (3) EPI account (15563). The amount of the circling checks is $30,000. The credit balances in the three accounts at the close on December 29 were: (1) Associates trust account (13030), $4,297.56; (2) Associates ordinary account (13022), $2,428.01; and (3) EPI account (15563), $16,725.72. It can be seen that no loan of $30,000 could be made to Mobley from any of these accounts nor from all of them put together.

The checks and deposit slips were all prepared at the same time in the Clardy offices by Shelton, assisted by two other employees of Clardy; they realized that they were writing checks in substantial amounts although the bank accounts had relatively small credit balances, wholly insufficient to meet the amounts of the checks. Shelton made all the deposits at the same time, after discussion with Clardy and after Clardy had telephoned to arrange for the Bank to stay open for him after normal hours. With the cooperation of Wells Fargo Bank, the deposits were all accepted and entered on the Bank's books as debits and credits. The Bank could afford to be cooperative because the debits and credits were equal. No balances at the Bank were affected and no loss to the Bank could occur.

Since all the checks circled and cleared the accounts in the same bank on the same day, December 30, it makes no difference where a description of the process begins.

Check 3927 payable to EPI for $30,000, dated December 30, is drawn on Associates trust account (13030). This check carries the legend: "Mobley—prepaid interest on contract of sale". Mobley on that date had a credit balance of $180.86. Check 3927 for $30,000 is deposited on December 30 in EPI account 15563.

Check 215 payable to "Capital Three Corporation" for $30,000, dated December 30, is drawn by EPI on its account (15563). This check carries the legend: "Loan from EPI". Check 215 for $30,000 is deposited on December 30 in Associates ordinary account (13022). Associates and "Capital Three Corporation" are one and the same.

Check 2354 payable to "Clardy Associates Trustee Account (Mobley)" for $30,000 dated December 30, is drawn by Associates on its account (13022). This check carries the legend: "Loan proceeds". Check 2354 for $30,000 is deposited with deposit slip 3272 on December 30 in Associates trust account (13030).

Thus the circle of checks is closed. In each of the three accounts at the same bank there is a debit and a credit of $30,000 on the same day, three separate sets of wash entries on the same day—of necessity on the same day because otherwise the checks could not clear as entries in the bank accounts. One man—Shelton, under the direction of Clardy—signed the checks, made the deposits and otherwise coordinated the process. The presence on the bank statements of other matching debit and credit entries at the same time makes it appear that similar tax maneuvers for other clients were under way simultaneously.

The prepayment of interest by Mobley was shown by Clardy on the master control card for Mobley kept in the Clardy offices. The credit balance of Mobley at opening on December 30, 1971, was $180.86. It was necessary to show his receipt of a loan from EPI *before* his prepayment of interest in order to give him a credit balance from which to prepay the interest to EPI. This was done. The first entry on December 30 was a credit entry tied to deposit slip 3272: "Loan proceeds from Cap 3 $30,000". Then the *next* entry is a debit tied to check 3927: "Prepaid interest $30,000". Since it is evident from the entries in the bank accounts that the "loan" is being made from the "prepaid interest", there is here also only an illusion.

### 5.

The pretended payment of prepaid interest by Ririe was a simpler process. The basic pattern was the same as with Mobley: a pretended loan by EPI, the supposed real estate seller, to Ririe to enable him to prepay the interest. Ririe was not then a shareholder of EPI nor a client of Clardy nor of EPI.

Under date of December 27, 1971, Ririe drew a check for $16,020 payable to EPI on his bank account at Exchange Bank in Santa Rosa. This was supposedly for prepaid interest. The difficulty was that Ririe on December 27 only had $149.90 in his bank account and by the close of December 28 and opening of December 29 the balance had fallen to $146.54.

Ririe was aware of the scheme to be followed because it was explained to him by Clardy in writing under date of December 28. Clardy expressed the opinion that the prepaid interest would be deductible but that "there is a very good chance that the Internal Revenue Service will reverse this transaction. . . ." Clardy advised that Ririe should "shelter" normal income in 1972 plus $16,020 and thus "should IRS reverse the interest deduction" he would escape income taxes also in 1972. With full knowledge, Ririe cooperated; indeed, he testified that were it not for the prepaid interest deduction "we wouldn't be entering into the contract."

At the opening on December 29, the EPI credit balance in its bank account was $705.72. On December 29 EPI deposited in its bank account (15563) the Ririe check for $16,020 (for which there was $146.54 in the Ririe bank account).

Then on December 29 EPI drew its check for $16,020 payable to Dr. Ririe. This was supposedly the loan to enable Ririe to prepay the interest, but the check for the "loan" was drawn against the check of the lender who had already purported to pay the interest.

Ririe took the EPI check for $16,020 and hastened to deposit it on the same day, December 29, in his account at Exchange Bank.

At this point, the two checks exchanged by EPI and Ririe were credited, one to the account of EPI and the other to the account of Ririe; they thus each could clear as debit book entries at the two banks, respectively.

On December 30 Wells Fargo debited the EPI bank account with $16,020, the amount of its check to Ririe. At the end of December 30 the credit balance in the EPI bank account was back to $705.72, the same balance as at the opening on December 29.

On December 31 Exchange Bank debited the Ririe bank account with $16,020, the amount of his check for prepaid interest to EPI. At the end of December 31, the credit balance in the Ririe bank account was $106.93.

The prepaid interest of $16,020 claimed on the Ririe return was represented by his worthless check given under the circumstances just described. Webster's Third New International Dictionary (p. 1247) gives the applicable definition of "kite": "to create a false bank balance by manipulating deposit accounts". This is what occurred here. No money nor bankable funds were employed (nor were they even available).

### 6.

We have stated, perhaps in more detail than necessary, what the jury could have found from the evidence.

The operative facts are not really disputed, however, and at one time counsel for Clardy felt obliged to admit that the claimed payments of interest were accomplished by check swapping or check kiting—described by counsel euphemistically as an "exchange of checks" (see, for example, Brief for appellant, pp. 16, 19, 20, 23, 28, 40, 41, 50). In describing what Clardy did it is necessary, in order to be entirely accurate, to use the two expressions: "check kiting" and "check swapping". This is because "check kiting" is usually understood to mean "a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two banks" (*Falconi v. Federal Deposit Insurance Corpora-*

*tion,* 257 F.2d 287, 289 (3d Cir. 1958)). In the case at bar, two banks were involved in the Ririe scheme but only one bank was employed in the Johnson and Mobley schemes; as to these latter, "check swapping" is a more accurate term.

The evidence required these admissions for Clardy in his brief: ". . . [i]n the present case, the sellers'/lenders' bank accounts did not have sufficient funds before the exchange of checks to cover the amount of the loan" (Brief for appellant, p. 22) and ". . . the question of overdrafts does not arise because at the time each check cleared the bank there were sufficient funds . . . as a result of the contemporaneous deposit of the check for prepaid interest." (Brief for appellant, p. 22.) Put in other words, the "loan" with which the interest is "paid" is made from a fictitious bank balance created by a deposit of the interest itself.

By the time of oral argument, it was realized that the effect of these admissions was to illuminate the sham character of the interest "prepayments". At argument counsel for Clardy "orally corrected" the "unnecessary concession" and (by leave) submitted a letter of explanation dated March 12, 1979, which among other things dealt with the "concession". There could be a further explanation only as to Mobley and Ririe; as to Johnson, the concession in the brief was conceded to be accurate.

### (a)

As to Mobley, the further explanation of March 12 for Clardy was as follows:

EPI advanced $30,000 to Capital Three Corporation, which lent the same amount to Mobley. The EPI check was presented for payment on December 30, 1971. (Ex. 12.2; Ex. 12.1 (bank statement)). On the day before, EPI's bank balance—as reconstituted by a Government witness— was $16,725. (Ex. 42, line 30.) On the day it was presented for payment, that balance was augmented by the deposit of *three* checks, the $30,000 check from Mobley and two unrelated ones, totalling $81,820. (Ex. 12.1.) The total available funds, therefore, was $98,545; even if the

$30,000 received from Mobley is disregarded, the unrelated funds available substantially exceeded the amount of the EPI loan.

We are unable to accept this explanation because it is contrary to the evidence. There were no "unrelated funds" available in the EPI bank account which "substantially exceeded the amount of the EPI loan". It is true that on December 30 EPI did deposit in its account two checks unrelated to Mobley aggregating $52,320, but these were offset by three EPI checks drawn on the account, which aggregated exactly $52,320, and which were charged to the EPI account on December 30. Two other checks were charged to the EPI account on that day, the Ririe "Loan" check of $16,020 and the Mobley "loan" check of $30,000. These could only be charged against the credits to EPI resulting from the interest "prepayments" of Ririe and Mobley. The credit balance in the EPI account at the end of December 30 was $705.72, exactly what it had been at the end of December 28.

### (b)

As to Ririe, the further explanation of March 12 for Clardy was as follows:

The Ririe transaction involved a loan by EPI of $16,020. That loan was made on December 29, 1971. (Exs. 12.8, 10.2.) On that date, by the Government's own reconstruction of EPI's average daily balance, EPI's balance was $16,725. (Ex. 42, line 30.) Thus there were sufficient unrelated funds in the account to cover EPI's check. And, contrary to Ms. Simpson's recollection during argument, those funds did *not* include the Mobley monies, which were not deposited until the next day.

We are unable to accept this explanation either, because it, too, is contrary to the evidence.

The $16,725.72 which was the credit balance in the EPI bank account at the end of December 29 was certainly not "unrelated funds". It was in fact the $16,020 prepaid interest check of Ririe deposited by EPI in

its account on December 29 plus the $705.72 which had been the credit balance to the account at the end of December 28. Nor was the "loan" to Ririe "made" on December 29. The EPI check was given him on that date and deposited by him in his bank account. That check was not charged to EPI's bank account until December 30, one day after the interest prepayment check of Ririe had already been credited to the same account. In other words, the "loan" was made from the prepaid interest which it was supposed to enable to be "paid". The sham and illusion seem as apparent to us as they must have been to the jury.

### 7.

■ The first and principal argument for appellant Clardy is that the prepaid interest deductions were lawful and proper under the Internal Revenue Code and therefore the evidence is not sufficient as a matter of law to sustain the conviction. We find this argument singularly lacking in merit.

The interest deduction is authorized by 26 U.S.C. § 163(a) reading in relevant part: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness". The taxpayers here were on a cash basis and thus the question is whether the interest deducted was "paid" by them.

That the interest deductions were of *prepaid* interest is of no significance; since 1945 at least "interest paid in advance for a period of five years constitutes an allowable deduction . . . for the year in which paid" (1945 Cum.Bull. 109).

The classic definition of "paid" in this context is "a payment [of] cash or its equivalent". *Helvering v. Price*, 309 U.S. 409, 413, 60 S.Ct. 673, 675, 84 L.Ed. 836 (1940).

■■ It is undisputed that if a new note is given to satisfy an interest obligation by a debtor on a cash basis, the interest has not been "paid". It is also undisputed that when money is borrowed and the interest is deducted from the principal in advance and the borrower given the net amount only, interest has not been "paid". *John C. Cleaver*, 6 T.C. 452 (1946), *affirmed*, 158 F.2d 342 (7th Cir. 1946), *cert. denied*, 330 U.S. 849, 67 S.Ct. 1093, 91 L.Ed. 1293 (1947).

Clardy relies on cases, of which a good example is *Newton A. Burgess*, 8 T.C. 47 (1947).

Burgess owed Archer & Co., described as "collateral note dealers", $4,136.44 as prepaid interest due on December 30, 1941, on a promissory note to Archer made December 30, 1940, and renewed from year to year.

Burgess borrowed $4,000 from Archer on a second note. The Archer $4,000 check was deposited by Burgess in his checking account at Summit Trust Co. in which there was a credit balance already of $3,180.79. Summit, by bank clearing, obtained payment of the Archer check on December 27.

Burgess gave Archer a check on his Summit Trust account for $4,219.33 payable to Archer and dated December 26. This was for the $4,136.44 prepaid interest due on the first note and $82.89 due on the second note. Archer's bank obtained payment of the $4,219.33 check by bank clearing on December 27 and it was charged to the account of Burgess at Summit Trust on December 31.

The question before the Tax Court was whether $4000 of the $4,219.33 interest check of December 26, the $4000 borrowed from Archer on the second note, was deductible on the 1941 tax return of Burgess.

No check kiting was involved. Archer had its own bank account which was evidently ample to cover all of its checks. The $4000 loan check was given to Burgess several days in advance of the giving by him of the interest check. The $4000 loan check was paid from Archer's account upon presentation; funds actually moved from Archer's Bank to Summit Trust.

The Tax Court, 10 to 6, held that the $4000 had been "paid" and was deductible. The majority relied on two facts distinguishing the case from those dealing with interest paid by note or interest withheld: (1) Burgess did not borrow the $4000 from Archer *solely* to pay the interest but he had several bills that were due; and (2) the loan

proceeds actually went into his bank account where they were commingled with his other funds and could not be traced to the interest payment. The six dissenting judges found the distinguishing facts "immaterial" and declared: "When a taxpayer, on a cash basis, borrows money from a creditor with which he pays interest upon a debt owed to that creditor, there has been no cash payment of interest upon a debt owed to that creditor, there has been no cash payment of interest which is deductible from gross income" (8 T.C. at 51). The First Circuit Court of Appeals found the dissent "more persuasive" (*Goodstein v. C. I. R.*, 267 F.2d 127, 131 (1959)). Judge Oakes in the Second Circuit has agreed with this finding. *Burck v. C. I. R.*, 533 F.2d 768, 770 fn. 3 (1976).

The two distinguishing facts which convinced the majority in *Burgess* are *not* to be found in the case at bar. First, the pretended loans here were *solely* to picture a payment of interest. Second, the necessity for kiting checks (because neither lenders nor borrowers had any money) enabled the so-called interest to be traced directly to the loan checks; not only were they in exactly the same amount but in the case of Johnson and Mobley, neither were delivered to borrower nor lender but were deposited by Clardy in the same bank account, the very account on which they were drawn and which was not the bank account of either the lender or the borrower. While there was a delivery of checks in the case of Ririe, it was necessary for Ririe to deliver his check for prepaid interest against insufficient funds in his bank account before he received a check for the loan, out of which the interest was pretended to be paid.

We have no hesitation in concluding that no prepaid interest was "paid" by Johnson, Mobley, or Ririe in 1971 and that the deduction on their returns for that year was wholly improper.

### 8.

Counsel for Clardy stress that this is a criminal prosecution rather than a civil action respecting taxes; then they argue that whether interest is "paid" is a "tax issue not free from doubt", that "there is room for honest disagreement", and that the conviction cannot be sustained because the belief that the deductions were proper "was one which an informed person could hold in good faith" (Brief for appellant, pp. 23, 24). Reliance is placed on *United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974).

The issue of interest payment is not "highly debatable". It is simply: was the interest paid or not? In the case at bar, neither the taxpayers nor the pretended lenders had a bank balance to permit any interest payment or loan therefor. By swapping worthless checks which nevertheless offset each other and by securing the cooperation of a friendly bank, they managed to get the checks entered as debits on the relevant bank accounts. It would be difficult, to say the least, for anyone to believe in good faith that this amounted to a payment of interest.

Nevertheless, the trial judge instructed the jury in this regard precisely as is now contended for by counsel to Clardy. After giving the essential elements of the offense word for word as set out in 2 Devitt and Blackmar, Federal Jury Practice and Instructions (3d ed.) 162–163, Judge Orrick later told the jury, in addition:

> If a person in good faith believes that an income tax return prepared and presented to the Internal Revenue Service as a result of his aid and assistance, or as a result of his counseling, procuring and advising, truthfully reports the allowable deductions of the taxpayer under the Internal Revenue laws, he cannot be guilty of willfully aiding and assisting in, and counseling, procuring and advising, the preparation and presentation of a false or fraudulent return.

The most important aspect of the operations here performed is that there was no substance behind the forms employed. In this respect, Judge Orrick instructed the jury:

> If you find from the evidence that transactions do not exist except in form and are otherwise unreal or sham, you

are to consider whether the defendant willfully engaged in such conduct for the purpose of procuring, counseling, advising, or preparing or presenting false federal income tax returns as charged in the indictment.

This is in accord with *Knetsch v. United States*, 364 U.S. 361, 82 S.Ct. 132, 5 L.Ed.2d 128 (1960), affirming a decision of this Court (272 F.2d 200) in a civil case involving the propriety of an interest deduction on a tax return. This Court had approved findings of the District Court that certain bonds "had been purchased solely to obtain a tax benefit; and . . . the alleged interest was not interest in fact, but the purchase price of a tax deduction". (272 F.2d at 201). The Supreme Court, in affirming, referred to the contract there involved as a "fiction" and a "sham" (364 U.S. at 366, 82 S.Ct. 132).

■ We have noted and considered the argument for Clardy (Brief, pp. 29–40) that the evidence is not sufficient to show sham. The argument is without any merit. The jury could properly conclude, and undoubtedly did conclude, that Clardy engineered the three paper transactions for the sole purpose of taking interest tax deductions without any serious intention by anyone at any time, 1971 as well as later, of completing any of the transactions.

### 9.

Reversible error is claimed for Clardy (Brief, pp. 40–42) in that the trial judge permitted an Internal Revenue Agent to testify as an expert witness that, with respect to the Johnson return, the "interest deduction is not deductible". It is argued that this is a question of law on which the judge should have instructed the jury. It is also said that the Agent should not have been permitted to testify because of prejudice to Clardy, the Agent perhaps being perceived by the jury "as authorized to communicate the official position of the Government. . . ." (Brief, p. 42). These objections were not made to the Court below. The objection there was that the Agent was not an expert and that it

would prejudice Clardy if he expressed an opinion on guilt or innocence.

■ Initially, we note that a trial judge exercises broad discretion in determining whether to admit or exclude expert evidence and his determination must be sustained unless manifestly erroneous. *Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1209 (9th Cir. 1979). Clardy no longer challenges the Agent's qualifications as an expert. See Fed.R.Evid. 702. Moreover, we believe that this type of testimony is relevant to the issue of willfulness where the theory of the defense is that there is a good faith dispute as to the interpretation of the tax laws. See *United States v. Garber*, 607 F.2d 92, 95–99 (5th Cir., 1979) (en banc). Although the opinion on the deductibility of the interest was intimately related to the question of Clardy's guilt or innocence, it was still admissible. Rule 704 of the Federal Rules of Evidence provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." This court has previously held that opinion testimony, similar to that given by the Agent, is admissible under this Rule. *United States v. Davis*, 564 F.2d 840, 845 (9th Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760. And, any prejudice which may have resulted to Clardy because of the Agent's position with the government, or otherwise, was dispelled by the clear instruction of Judge Orrick at the time, namely, that the expert opinion could be given whatever weight the jury wished to give it, "taking into consideration the position of the expert, his relationship to the parties . . ." etc. and that "the jury doesn't have to believe any expert . . .". We therefore reject all the arguments as to the expert testimony, whether raised in the trial court or raised here for the first time.

### 10.

Appellant urges reversal because of the admission of testimony from two accountants, Heller and Kimes, which testimony he

describes as "character evidence" (Brief, pp. 42, 43, 44). It is claimed that this "character evidence" was "to show the defendant's propensity to commit the crimes charged" (Brief, p. 42), was "to show Appellant's propensity to organize sinister or fraudulent schemes" (Brief, p. 43), and was in violation of Rule 404 of the Federal Rules of Evidence.

Heller had been the accountant for Johnson for several years, preparing his tax returns including that for the year 1970. But the relationship was terminated in November 1971 and Johnson, at the suggestion of Clardy, switched to having his accounting done by the Clardy office; the 1971 tax return for Johnson was not prepared by Heller but, at Clardy's request, by Smith. Heller testified at trial that he had told Johnson that by investing with Clardy he (Johnson) was making a great mistake.

Kimes was in the accounting firm which for several years had done the accounting work of Mobley, preparing his tax returns including that for the year 1970. But the relationship terminated in October 1971. Thereafter, the accounting work of Mobley was done by Clardy's office; the 1971 tax return for Mobley was not prepared by Kimes' firm but, at Clardy's request, by Smith. Kimes testified that he was uncomfortable with Clardy's real estate ventures.

The Johnson 1971 tax return was the subject of the first count. The Mobley 1971 tax return was the subject of the second count. Both these returns were the first returns prepared for these taxpayers by Smith and it was Clardy, the defendant, who arranged for the preparation by Smith. These taxpayers, then clients of Clardy, had theretofore had their returns prepared by other accountants, Johnson by Heller and Mobley by Kimes. The two taxpayers, Johnson and Mobley, had each testified and had told about the shift of their accounting and tax return work to Clardy and Smith. It was highly relevant for the prosecution to show the circumstances under which the former accounting relationships of Johnson and Mobley had been terminated, including specifically the extent to which Clardy and his activities had caused the termination and what advice or warning their former accountants had given Johnson and Mobley for the future. It was therefore admissible under Rules 401 and 402 of the Federal Rules of Evidence. This evidence was not, as Clardy claims, used by the prosecution to prove Clardy's character; thus Rule 404 and the cases cited by Clardy do not apply. The trial judge exercises wide discretion in balancing the probative value of relevant evidence against its possible prejudicial impact upon the jury under Rule 403. *See United States v. Hearst*, 563 F.2d 1331, 1336 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90. In this case, the district court did not abuse its discretion in the balance which was struck.

We conclude that the testimony of the two accountants to the termination of their relationship with Johnson and Mobley was relevant and properly admitted.

### 11.

The last point for appellant is that Nancy L. Simpson was an attorney employed by the Internal Revenue Service and who recommended criminal prosecution of Clardy; that she thereafter became an Assistant United States Attorney; and that she assisted "in the grand jury investigation and subsequent prosecution of the case against Appellant". (Brief, p. 48). The claim is that Ms. Simpson had a "conflict of interest" (Brief, p. 48). There is no claim that there was any misconduct by Ms. Simpson and our study of the record reveals no basis for any such claim. It is said for Clardy, however: "The issue presented concerns appearances, and rests upon a prophylactic principle which imposes a strict rule of disqualification in the circumstances of this case" (Brief, p. 49).

The government states in its brief (p. 22) that all the facts on which this point is based were known to trial counsel. This is not disputed in the reply brief for appellant. A "declaration" of Ms. Simpson, filed January 10, 1978, made the facts a matter of record at that time. No motion was made in the Court below to disqualify Ms. Simp-

son nor was the matter called in any way to the attention of the District Court. The point is raised for the first time on this appeal. Because the matter was not raised in the court below, we decline to review the question whether Ms. Simpson was disqualified or not.

AFFIRMED.