JOHN C. BECK AND KATHLEEN BECK, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6670–78.    Filed September 29, 1980.

*Alan R. Herson* and *Samuel A. Karlin,* for the petitioners.
*David P. Fuller,* for the respondent.

NIMS, *Judge:* Respondent determined a deficiency in petitioners' income taxes for the year 1974 of $29,067. The substantive issue remaining for our decision is whether deductions for loan points and prepaid interest claimed in 1974 by two limited partnerships, Moreno Co. Two and Riverside Two, are allowable under section 163(a).[1] Should we find against respondent on this issue, we must decide:

(1) Whether deductions claimed by Moreno Co. Two and Riverside Two in 1974 for prepaid interest and loan points caused a material distortion of income and whether, pursuant to section 446(b), the claimed deductions should be allocated over the period for which the interest and points were prepaid.

(2) Whether losses claimed by the petitioners on their 1974 tax return with respect to Moreno Co. Two and Riverside Two should be reduced pursuant to the limitation on investment interest deductions set forth in section 163(d).

(3) Whether the petitioners' adjusted basis in Moreno Co. Two is limited, by operation of section 752(c), to $35,910.

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and exhibits attached thereto are incorported by this reference.

The petitioners resided in California at the time their petition was filed.

During the year 1974, petitioners were limited partners in each of two partnerships, Moreno Co. Two (Moreno 2) and Riverside Two (Riverside 2). Moreno 2 and Riverside 2 were 2 of 14 limited partnerships which each purchased a portion of a 350-acre tract of land from Go Publishing Co. (Go Publ.) in December 1974. The overall transaction was promoted by Joseph R. Laird, Jr. (Laird), who also served as president of CAL–AM Corp. (CAL–AM), which was the general partner of these partnerships. The property was acquired on a leveraged basis with each partnership paying substantial loan points and prepaid interest. In 1975, the two limited partnerships sold the property to Bio-Science Resources, Inc. (Bio-Sci). The prepaid interest and interest points were disallowed by the Commissioner.

### The Entities

Moreno 2 and Riverside 2 are California limited partnerships that were formed in 1974. The sole general partner of Moreno 2 and Riverside 2 was CAL–AM. Laird has at all times relevant hereto been the president and principal operating officer of CAL–AM. During 1974 and until June of 1978, Kenneth J. Fisher (Fisher) was the secretary of CAL–AM. During the taxable year 1974, the principal place of business of both partnerships as well as CAL–AM was 16055 Ventura Boulevard, Suite 625, Encino, Calif.

On December 26, 1974, petitioners became limited partners in Moreno 2 by subscribing for 10 units of the partnership at $1,026 per unit for a total cost of $10,260. Total contributions to capital to Moreno 2 were $108,000, of which $102,600 (95 percent) was contributed by the limited partners, and $5,400 (5 percent) was contributed by CAL–AM. Accordingly, the petitioners held a 9.5-percent interest in Moreno 2.

On December 31, 1974, petitioners became limited partners in Riverside 2 by subscribing for 100 units of the partnership at $128.25 per unit for a total cost of $12,825. Contributions to

capital totaled $13,500, of which 95 percent was contributed by the petitioners as sole limited partners, and $675 (5 percent) was contributed by CAL–AM. Accordingly, the petitioners held a 95-percent interest in Riverside 2.

Laird, who was the promoter of these limited partnership transactions, is an attorney, and he controlled either directly or indirectly many of the entities that are involved in this case. He owned 80 percent of CAL–AM. CAL–AM's board of directors consisted of Laird and Kenneth Yates.

Bio-Sci is an affiliate of CAL–AM. Laird is its president, and Fisher was its secretary during 1975 and until June of 1978. At all times relevent, Laird controlled the activities and functions of Bio-Sci.

The partnerships borrowed the money with which to pay the loan points from J.E.C. Mortgage Corp. (J.E.C.), which is a California corporation with its principal place of business in Los Angeles, Calif. Laird controlled the activities and functions of J.E.C.

Ultimately, by 1978, the subject properties, as well as properties purchased in 1974 by other limited partnerships promoted by Laird, were all acquired by North Coast Financial, Inc. (North Coast Financial), an Oregon corporation affiliated with CAL–AM. North Coast Financial was controlled by Laird.

*Transactions*

During the latter half of December 1974, CAL–AM, as promoter and general partner, established 14 limited partnerships which acquired approximately 350 contiguous acres of unimproved land in Riverside County, Calif. The offering circular for these limited partnerships described the terms of the transaction in detail, and it also contained an extensive discussion of the prospects for the 350-acre parcel. Standing alone on page 1 of the Moreno 2 circular was the following statement: "$10,260 investment * * * $41,135—total 1974 tax loss. Each additional investment of $1,026.00 equals an additional $4,113.50 1974 tax loss."

The offering circulars of Moreno 2 and Riverside 2 described the promoters' program for master planning and development of the 350-acre tract which included the respective partnerships' land. Subsequent to 1974, the year in question, substantial development of the entire tract occurred. Most of the develop-

ment took place, however, after the partnerships had conveyed their land to Bio-Sci in 1975.

Laird and his associates basically looked upon their responsibility as that contained in the partnership agreements. However, neither agreement contained any commitment on the part of anyone to develop the partnership land or the 350-acre tract. Likewise, no prior verbal commitment to do so was ever made to the partnerships.

Notwithstanding the absence of such an agreement of commitment, a letter from Laird, on behalf of CAL–AM, to Southern California Financial Corp., dated May 20, 1975, reads in pertinent part as follows:

In June 1974, CAL–AM initiated a program to solicit investors for the immediate development of 240 acres west of Morrison Street. * * * Under the development program, CAL–AM would Master Plan the property and obtain approvals from the various governmental agencies for specific densities, land use, and offsite requirements for the project. Builders would then be invited to come in and improve the property within the framework of the Master Plan thus satisfying the obligations of CAL–AM to its investors.

Ten of the 14 partnerships (including the two to which petitioners belonged) acquired their interests in the 350-acre tract from Go Publ. on essentially identical terms: i.e., a very small cash downpayment, a nonrecourse purchase-money loan from Go Publ. secured by an all-inclusive trust deed, and a second nonrecourse loan from J.E.C. to fund the loan point payment which was also secured by a trust deed. These partnerships then sold the properties to Bio-Sci in 1975 for little or no cash and large nonrecourse notes. The properties then passed through related entities and in 1978 were acquired by North Coast Financial.

As detailed below, Moreno 2 acquired eight lots in 1974 and disposed of these lots in November 1975; Riverside 2 acquired one lot in 1974 and disposed of it in 1975.

### a. *Moreno Co. 2*

On September 12, 1972, Kenneth E. Fisher and Betty Louise Fisher, his wife, purchased eight parcels of unimproved land located in Riverside County, Calif., denominated lots 16–3, 16–4, 16–5, 16–6, 25–3, 25–4, 25–5, and 25–6.[2] Kenneth E. Fisher is the

[2]More specifically, these are lots 3, 4, 5, and 6 of block 16, and lots 3, 4, 5, and 6 of block 25, as shown in Map No. 1 of the Bear Valley and Allesandro Tract of the Official Records of San Bernardino County, Calif.

father of Kenneth J. Fisher (referred to above as Fisher), who, at the time of this transaction, was an employee of Southern California Financial Corp. The purchase price was $320,000, of which $288,000 was represented by a promissory note secured by a first trust deed on the subject lots.

On October 31, 1972, Kenneth E. Fisher and Betty Louise Fisher sold the eight lots to K. E. Fisher Enterprises, Inc., for $512,000. Payment of the entire purchase price was made by a promissory note secured by an all-inclusive trust deed on the eight lots.

On November 1, 1972, K. E. Fisher Enterprises sold the lots, four each to two partnerships, Moreno Properties 3 and Moreno Properties 4:[3] The costs to each partnership was $258,823; each partnership paid $823 down and borrowed the balance, each giving two deeds of trust on their newly acquired property in the amounts of $219,300 and $38,700.

On December 26, 1974, CAL–AM purchased the eight lots from Moreno Properties 3 and Moreno Properties 4 of $82,500 and $103,500, respectively. The $82,500 consisted of $165 cash and a promissory note in the amount of $82,335 secured by an all-inclusive trust deed on the subject lots; the $103,500 consisted of $375 cash and a $103,125 promissory note with similar security.

On December 27, 1974, CAL–AM sold 20 contiguous parcels of unimproved land to Go Publ. for $600,000. Payment of the entire purchase price was made by a promissory note secured by an all-inclusive trust deed on the land. Among the 20 contiguous parcels were the above eight lots.

On December 30, 1974, the eight lots were then sold by Go Publ. to Moreno Co. 2. The purchase price was $1,008,000. The terms of the sale were as follows:

(a) An $8,000 cash downpayment;

(b) A $1 million nonrecourse promissory note made by Moreno Co. 2 in favor of Go Publ., secured by an all-inclusive trust deed on the eight lots in the amount of $1 million;

(c) Twelve months' prepaid interest on the note due on or before December 31, 1974, in the amount of $100,000; and

(d) Loan points in the amount of $333,000.

---

[3]Moreno Properties 4 acquired lots 16–3 and 16–6, 25–3, and 25–6; Moreno Properties 3 acquired lots 4 and 5 of those same blocks.

The purchase-money note given by Moreno 2 to Go Publ. was executed by Laird as president of CAL–AM, the general partner of Moreno 2, and by Fisher, as secretary of Go Publ. This note has the following characteristics:

(a) An unpaid principal balance of $1 million;

(b) An interest rate of 10 percent from January 1, 1975, to and including December 31, 1975;

(c) An interest rate of 5 percent from January 1, 1976, until the note is paid; and

(d) Annual payments of interest in the amount of $50,000 commencing on January 1, 1977, and continuing until January 1, 1985; thereafter, payable in monthly installments of principal and interest in the amount of $5,846 each commencing on February 1, 1985, and continuing until paid.

On or about December 27, 1974, Moreno 2 wrote checks to Go Publ. in the total amount of $441,000. This amount was allocated as follows: $8,000 as downpayment on the land purchased from Go. Publ.; $100,000 for 12 months' prepaid interest; and $333,000 for loan points. Moreno 2 was able to write these checks because it "borrowed" $333,000 from J.E.C., giving as security a trust deed in that amount.

On November 1, 1975, Moreno 2 sold the eight lots described above to Bio-Sci. Bio-Sci took the property subject to the $1-million obligation owed by Moreno 2 to Go Publ., and took the eight lots subject to the trust deed record in Go Publ.'s favor. In addition, Bio-Sci gave Moreno 2 a promissory note signed by Laird, as president of Bio-Sci, in the amount of $520,000 with the following terms:

(a) Eight annual installments of interest only, commencing on December 31, 1977;

(b) Interest to accrue from January 1, 1976, at 6.5 percent per annum; and

(c) Monthly payments in the amount of $3,330 each, including interest, commencing on February 1, 1985, and continuing until paid; all due and payable on December 31, 1995.

Moreno 2 elected to report its gain on the installment sale method: consequently, its 1975 partnership tax return showed no gain from this sale, and no income.

The purchase of the eight lots by Bio-Sci was coincidental with a reconveyance, or release, of the trust deed that had been recorded in favor of J.E.C. with respect to its nonrecourse loan

to Moreno 2 in the amount of $333,000. Although its security interest was released at that time, J.E.C.'s loan was not paid off. On the date of the above transaction—November 1, 1975—Bio-Sci, in turn, sold four of the lots to Lake Perris Co., a limited partnership, in a transaction similar to the sale to Moreno 2. CAL–AM is the general partner of Lake Perris Co. Subsequently, Bio-Sci transferred other portions of the original Moreno 2 tract to other Laird entities for no additional consideration other than the transferee's agreement to take the lots subject to previously existing trust deeds and related obligations.

On April 1, 1978, the eight lots were transferred to North Coast Financial. These transfers were also for no additional consideration.

In 1979, North Coast Financial made sales of portions of the land formerly owned by Moreno 2. Income generated by these sales was insufficient to liquidate debt encumbering this property.

On December 17, 1979, Bio-Sci paid Moreno 2 $24,105.53, which included a principal payment of $22,750 and an interest payment of $1,355.53. Moreno 2 made distributions to the limited partners on December 11, 1979; petitioners received $779.12.

### b. Riverside 2

Sometime prior to 1974, Fisher acquired (from Southern California Financial) a parcel of unimproved land located in Riverside County, Calif. (lot 23–2).[4] Subsequently, Fisher transferred ownership of lot 23–2 to South 23–2, a partnership. Thereafter, but still prior to 1974, ownership of this lot reverted back to Southern California Financial.

On December 23, 1974, CAL–AM Finanical Corp., a Laird-controlled entity, purchased unimproved lot 23–2 from Southern California Financial for $55,000. Payment was made as follows: $5,500 cash down, with the balance of the purchase price paid by a promissory note in the amount of $49,500, secured by a deed of trust on the lot.

On December 30, 1974, CAL–AM Financial Corp. sold 11 contiguous parcels of unimproved land to Go Publ. for $660,000.

---

[4]More specifically, it is lot 2 of block 23 as shown in Map No. 1 of the Bear Valley and Allesandro Tract of the Official Records of San Bernardino County, Calif.

Payment of the entire purchase price was made by promissory note secured by an all-inclusive deed of trust on the land. Among the 11 contiguous parcels was lot 23–2.

On December 30, 1974, lot 23–2 was sold by Go Publ. to Riverside 2 for $126,000. The terms of the sale were as follows:

(a) A $1,000 cash downpayment;

(b) A $125,000 nonrecourse promissory note made by Riverside 2 in favor of Go Publ. secured by an all-inclusive trust deed on the lot in the amount of $125,000;

(c) 12 months' prepaid interest on the note due on or before December 31, 1974, in the amount of $12,500; and

(d) Loan points in the amount of $41,625.

The purchase-money note given by Riverside 2 to Go Publ. was executed by Laird as president of CAL–AM (the general partner of Riverside 2) and by Fisher, as secretary of Go Publ. This note had the following characteristics:

(a) An unpaid principal balance of $125,000;

(b) An interest rate of 10 percent from January 1, 1975, to and including December 31, 1975;

(c) An interest rate of 5 percent from January 1, 1976, until the note is paid; and

(d) Annual payments of interest in the amount of $6,250 each, commencing on January 1, 1977, and continuing until January 1, 1985; thereafter, monthly installments of principal and interest in the amount of $730.75 each, commencing on February 1, 1985, and continuing until paid.

On or about December 26, 1974, Riverside 2 wrote checks to Go Publ. in the total amount of $55,125. This amount was allocated as follows: $1,000 downpayment on the land purchased from Go Publ; $12,500 for 12 months' prepaid interest; and $41,625 for loan points. Riverside 2 was able to write these checks because it "borrowed" $41,625 from J.E.C., giving as security a trust deed in that amount.

On November 1, 1975, Riverside 2 sold its lot to Bio-Sci for $190,000. Bio-Sci assumed the $125,000 obligation owed by Riverside 2 to Go Publ. and took the lot subject to the trust deed recorded in Go Publ.'s favor. In addition, Bio-Sci gave Riverside 2 a promissory note in the amount of $65,000 with the following terms:

(a) Eight annual installments of interest only, commencing on December 31, 1977;

(b) Interest to accrue from January 1, 1976, at 6.5 percent per annum; and

(c) Monthly payments in the amount of $416.25, including interest, commencing on February 1, 1985, and continuing until paid; all due and payable on December 31, 1995.

Riverside 2 elected to report its gain on the installment sale method. Consequently, its 1975 partnership tax return showed no gain from this sale, and no income.

The purchase of this lot by Bio-Sci was coincidental with a reconveyance, or release, of the trust deed recorded in favor of J.E.C. with respect to its nonrecourse loan to Riverside 2 in the amount of $41,625. Although its security interest was released, J.E.C.'s loan was not simultaneously paid off.

On November 1, 1975, Bio-Sci in turn sold lot 23–2 along with three other lots to Sunnymead Co., a limited partnership, in a transaction similar to Riverside 2's purchase from Go Publ. CAL–AM is the general partner of Sunnymead Co. Aside from lot 23–2, the other lots acquired by Sunnymead Co. were lot 23–7 and lots 25–2 and 25–7.[5]

On January 13, 1978, Sunnymead Co. transferred its four lots to CAL–AM Land Development, Inc., and on April 1, 1978, CAL–AM Land Development, Inc., transferred these same four lots to North Coast Financial.

On January 4, 1979, Tract No. 6774, which consisted of lots 23–1 and 23–2, formerly owned by Riverside 1 and Riverside 2, respectively, was sold by North Coast Financial to Andrews Development Co., presumably an independent third party, for a purported sum of $418,352. Of this amount, $250,000 was attributed to certain property accepted by North Coast Financial as part of the sale. Lots 23–1 and 23–2 are contiguous and are of equal size and value.

During the approximately 4-year period between Riverside 2's acquisition of lot 23–2 and its sale by North Coast Financial, lot 23–2 was encumbered with the following trust deeds securing nonrecourse obligations:

---

[5]More specifically, these were lot 7 of block 23, and lots 2 and 7 of block 25, as shown in Map No. 1 of the Bear Valley and Allesandro Tract of the Official Records of San Bernardino County, Calif.

| Trustor (debtor) | Beneficiary (lender) | Amount |
|---|---|---|
| Riverside 2 | J.E.C. | $41,625 |
| Riverside 2[1] | Go Publ. | 125,000 |
| Sunnymead Co. | Legal Mortgage Corp. | 163,000 |
| Sunnymead Co.[1] | Bio-Sci | 760,000 |

[1] Purchase-money obligations.

The purchase money-obligations were used to pay principal; the proceeds of the loan from J.E.C. and Legal Mortgage Corp. were used to pay points and interest. The trust deed securing J.E.C.'s loan was transferred back when the property was sold to Bio-Sci in 1975. Since the encumbrances securing the obligations owed by Sunnymead Co. to Legal Mortgage Corp. and Bio-Sci relate to three other lots in addition to lot 23–2, the total amount of encumbrances allocable to lot 23–2 referred to above is:

| Trustor (debtor) | Beneficiary (lender) | Amount |
|---|---|---|
| Riverside 2 | J.E.C. | $41,625 |
| Riverside 2[1] | Go Publ. | 125,000 |
| Sunnymead Co. | Legal Mortgage Corp. | 40,750 |
| Sunnymead Co.[1] | Bio-Sci | 190,000 |
| Total | | 397,375 |

[1] Purchase-money obligations.

In addition, since the second purchase-money trust deed was all-inclusive, it "wraps-around" the first. Accordingly, the amount of money required merely to extinguish the obligations encumbering lot 23–2 would be:

| Lender | Amount |
|---|---|
| J.E.C | $41,625 |
| Legal Mortgage Corp | 40,750 |
| Bio-Sci | 190,000 |
| Total | 272,375 |

Similarly, in the 4-year period between Riverside 1's acquisition of lot 23–1 and its sale as part of Tract No. 6774, lot 23–1 was encumbered with the following trust deeds securing nonrecourse obligations:

| Trustor (debtor) | Beneficiary (lender) | Amount |
|---|---|---|
| Riverside 1 | J.E.C. | $41,625 |
| Riverside 1[1] | Go Publ. | 105,000 |
| Total | | 146,625 |

[1] Purchase-money obligation.

Thus, cash of $419,000 would be required to extinguish the debts encumbering lots 23–1 and 23–2. Accordingly, in order to liquidate all the debt encumbering Tract No. 6774, and to recover the cash outlay associated with sale, at least $419,000 would have to be realized upon the sale.

Simultaneously with North Coast Financial's sale of lot 23–2 to Andrews Development, Go Publ. released, for no consideration, trust deeds securing the nonrecourse purchase-money loans owed to it as a result of its sale of these lots in 1974 to Riverside 1 and Riverside 2. Legal Mortgage Corp. and Bio-Sci also released their respective security interests in the property on the same date for no consideration. J.E.C. had already released its security interest in 1975 without consideration.

On October 10, 1979, Bio-Sci paid Riverside 2 $68,274 in cash, $3,274 of which was allocated to interest and $65,000 of which was allocated to principal. (Bio-Sci gave Riverside 2 a $65,000 note in 1975 when it purchased lot 23–2.) On that same date, Riverside 2 paid J.E.C. $44,851, which was the entire amount of the principal and interest due J.E.C., and it also distributed $22,312.50 to petitioners. Riverside 2 wound up its affairs and concluded its activity at that time.

No similar payment was made by Bio-Sci to Riverside 1 (of which petitioners are not partners) or by Riverside 1 to J.E.C. or to the limited partners of Riverside 1.

### Financing the Transactions

As indicated, the purchases by the partnerships were financed largely through nonrecourse financing. In each case, the minimum downpayment and the 12 months' prepaid interest were satisfied out of funds contributed by the partners. In addition, the terms of the sales called for Moreno 2 and Riverside 2 to pay loan points of $333,000 and $41,625, respectively.

Moreno 2 and Riverside 2 "paid" their points by means of a circular exchange of checks. This exchange, involving Go Publ. (the seller), J.E.C. (a Laird-controlled entity), and eight other

similarly situated partnerships, was accomplished in the following manner:

(1) Between December 26 and 31, 1974, Go Publ. purchased cashier's checks payable to J.E.C. in the amount of $1,542,500. J.E.C. deposited these checks to its account number 04–00834–0 at the American National Bank in Palmdale, Calif.

(2) Between the dates of December 26 and 30, 1974, J.E.C. purchased cashier's checks payable to 10 CAL–AM-promoted partnerships, including Moreno 2 and Riverside 2, in the combined amount of $1,498,500. The partnerships deposited these checks to their respective accounts at the Bank of America, Culver Center Branch, in Culver City, Calif. In the case of Moreno 2 and Riverside 2, the checks received from J.E.C. totaled $333,000 and $41,625, respectively.

(3) The 10 partnerships, among them, Moreno 2 and Riverside 2, then wrote checks back to Go. Publ. in the total amount of $1,984,500. Once again, the checks were written between the dates of December 26 and 30, 1974. $486,000 of this amount was drawn from capital contributions to the 10 partnerships. The remaining $1,498,500 represented the aforementioned funds advanced to the partnerships by Go Publ. through J.E.C. In the case of Moreno 2, checks totaling $441,000 were written to Go Publ. and allocated as follows: $8,000 downpayment; $100,000 prepaid interest; and $333,000 for loan points. In the case of Riverside 2, the checks written to Go Publ. totaled $55,125 and represented a $1,000 downpayment, $12,500 prepaid interest, and $41,625 for loan points.

The bank accounts of the 10 CAL–AM-promoted partnerships, including Moreno 2 and Riverside 2, were all opened on December 24, 1974, each with a $100 deposit. A day or two later, the capital contributions of the various partners were deposited, and shortly thereafter, the aforementioned cashier's checks were received from J.E.C. and deposited. In the case of Moreno 2, the partners' contributions were $108,000 and the checks from J.E.C. totaled $333,000. In the case of Riverside 2, these amounts were $13,500 and $41,625, respectively. After the partnerships wrote their checks to Go Publ., as set forth above, they were each left with an ending balance on December 31, 1974, of $100.

These "loans" from J.E.C. to the limited partnerships were nonrecourse with the only security being a trust deed on the property acquired from Go Publ. The limited partnerships each

executed a promissory note for the $333,000 in favor of J.E.C. with the following terms:

(a) Interest to accrue from January 1, 1975;

(b) Nine annual installments of interest only, at the rate of 10 percent per annum commencing on December 31, 1976; and

(c) Monthly installments in the amount of $3,330 for Moreno 2 and $416.25 for Riverside 2 including interest at 10 percent per annum, commencing on February 1, 1985, and continuing until paid.

The promissory notes were executed by Laird, as president of CAL–AM, the general partner of Riverside 2.

The funds advanced by Go. Publ. to J.E.C. were evidenced by a promissory note. No security or collateral was provided by J.E.C. to secure the funds advanced by Go Publ. J.E.C's "obligation" to repay Go Publ. was completely contingent upon its collection of funds "loaned" to Moreno 2, Riverside 2, and the other eight partnerships as evidenced by the following language:

> The obligation of J.E.C. * * * set forth herein * * * is subject to collection * * * of principal represented in notes secured by Deeds of Trust payable to J.E.C. * * * by various Limited Partnerships with reference to real property located in Riverside County. To the extent payments are not received pursuant to said Notes and Deeds of Trust that amount will be deducted from the principal amount of the above Promissory Note.

J.E.C.'s bank account number–04–00834–0 at the American National Bank in Palmdale, Calif., was opened on December 13, 1974, with a deposit of $50. The activity in this account for December 1974 was as follows:

| | | | |
|---|---|---|---|
| Account opened 12/13/74 | | | $50 |
| Deposits: | | | |
| From Go Publ | | $1,542,500 | |
| Disbursements: | | | |
| To Go Publ | $42,000 | | |
| To various partnerships | 1,498,500 | 1,540,500 | 2,000 |
| Balance at 12/31/74 | | | 2,050 |

Go Publ.'s bank account number 0348–2–00228 at the Bank of America, Culver Center Branch, Culver City, Calif., was opened on December 24, 1974, with a deposit of $100. The activity in this account for December 1974 was as follows:

| | | | |
|---|---|---|---|
| Account opened 12/24/74 ..................................... | | | $100 |
| Deposits: | | | |
| From CAL–AM .................. | $10,000 | | |
| From various partnerships ... | 1,984,500 | $1,994,500 | |
| Disbursements: | | | |
| To J.E.C .......................... | 1,542,500 | | |
| To CAL–AM ..................... | 266,000 | | |
| To CAL–AM Financial ........ | 100,000 | 1,908,500 | 86,000 |
| Balance at 12/31/74 ................................................ | | | 86,100 |

No contractual agreement between Moreno 2 and Riverside 2, respectively, and any other entity required the development of the real estate acquired by the partnerships as a condition of or as partial consideration for the purchase of such real estate.

The fair market value of the property acquired by Moreno 2 on December 30, 1974, was $270,000.

The fair market value of the property acquired by Riverside 2 on December 30, 1974, was $42,500.

## OPINION

We are called upon this case to determine the amount, if any, of petitioners' partnership loss arising out of their interests in a partnership known as Catalina Co., as well as whether petitioners are entitled to deduct claimed losses totaling $92,554 arising from prepaid interest and loan points allegedly paid by two partnerships, Riverside 2 and Moreno 2, in which petitioners held limited partnership interests.

Petitioners submitted no evidence to contest the determination regarding Catalina Co. and, on brief, simply contended that respondent "arbitrarily limited petitioners' deduction of the pro-rata loss of the Catalina Company without any explanation" which would enable petitioners to present any evidence.[6]

For reasons discussed with regard to the main issue in dispute, we find no legal merit in petitioners' argument that respondent acted arbitrarily. We consider petitioners' failure to adduce probative evidence on the question of the Catalina partnership

---

[6]Respondent disallowed $1,062 of petitioners' claimed loss arising out of their membership in a partnership known as Catalina Co. for the stated reason that: "An examination of the books and records of the partnership * * * discloses your share of the partnership loss to be $889.00." As a result of this adjustment, respondent also allowed petitioners an increased capital loss deduction of $1,000 which resulted in a $1,000 decrease in taxable income.

loss to be a concession that they have abandoned this issue. Respondent's determination on this point is therefore sustained.

Before summarizing that somewhat complex set of facts regarding the Moreno 2 and Riverside 2 transactions, we will briefly address some preliminary arguments raised by petitioners regarding the burden of proof. Unless otherwise provided by law, the taxpayer has the burden of proving that the Commissioner's deficiency determination is incorrect. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In an attempt to shift to respondent the burden of proof, petitioners claim that the determinations contained in the notice of deficiency were arbitrary and excessive. We observe, however, that the deficiency asserted by the Commissioner in this case arises from the disallowance of claimed deductions.

Therefore, in this case, as in most deduction cases, an inquiry into the methodology of the Commissioner's determination would not shed light on the petitioners' correct tax liability.[7] We accordingly hold that the burden of proof is on the petitioners to prove that they qualify for the deductions herein claimed.

Petitioners' second contention of a procedural nature is focused on an alleged contradistinction between the language employed in the notice of deficieny[8] and respondent's legal theories on brief. The evidence adduced at trial shows that funds were available for the checks used by petitioners to make the payment of loan points because of a complex check-swapping scheme. On brief, respondent focuses on this scheme and contends that there was no "payment" of interest within the meaning of section 163. Petitioners characterize this point as a "new matter."

---

[7]See *Churukian v. Commissioner*, T.C. Memo. 1980–205; cf. certain highly unusual gross income cases such as *Jackson v. Commissioner*, 73 T.C. 394 (1979); *Llorente v. Commissioner*, 74 T.C. 260 (1980); *Weimerskirch v. Commissioner*, 67 T.C. 672 (1977), revd. 596 F.2d 358 (9th Cir. 1979).

[8]The notice of deficiency set forth the following grounds for disallowing the partnership losses:

"It is determined that losses claimed on your 1974 return with respect to partnerships known as Moreno Company Two and Riverside Two (hereinafter referred to as "Moreno" and "Riverside", respectively) are not allowable because you have failed to establish that the transactions in which Moreno and Riverside were involved were bona fide arm's-length transactions at fair market value, that such transactions were entered into for profit, or that such transactions had any economic purpose or substance other than the avoidance of taxes."

As a general rule, respondent bears the burden of proof for "new matters." Rule 142(a), *supra*. However, petitioners refused, when asked, to execute a consent to extend the statute of limitations, and such refusal resulted in an early issuance of the notice of deficiency. In such circumstances, the taxpayers (and not respondent) are generally held accountable for any imprecision in the language employed in the notice of deficiency and for any procedural or evidentiary consequences flowing therefrom. See *Chaum v. Commissioner*, 69 T.C. 156 (1977); *Durovic v. Commissioner*, 54 T.C. 1364 (1970), affd. in part, revd. in part, and remanded in part without discussion of this issue 487 F.2d 36 (7th Cir. 1973), cert. denied 417 U.S. 919 (1974). We note, in this regard, that petitioners have made no claim that they were surprised by this turn of events or that they have been prejudiced.

More to the point, however, we find petitioners' contention that this is a "new matter" to be without merit. Respondent's "check-swapping" argument takes square aim at the bona fides of the prepaid interest payments, and it fits well within the scope, to track the notice of deficiency, of transactions that were not "bona fide arm's-length transactions at fair market value." We conclude that it clearly fits within the purview of the notice of deficiency.

---

With these procedural matters put to rest, we turn to the merits of the case. The case involves petitioners' claimed losses on their 1974 income tax return totaling $92,554 resulting from their interest in two partnerships, Moreno 2 and Riverside 2. These losses were attributable to certain deductions claimed at the partnership level for prepaid interest and loan points. At issue in this case is whether the deductions taken by Moreno 2 and Riverside 2 are allowable under section 163(a). While the facts are set forth in detail in our findings, a brief synopsis is in order here.

Before detailing the transactions, we think it wise to make a general comment about the cast of characters. While the large number of entities makes it difficult, at times, to follow the transactions through to the end, it is helpful to bear in mind that most of the entities were owned and/or controlled by one Joseph R. Laird, Jr., the promoter of these and many similar "invest-

ment opportunities." Laird was the president and controlling officer of CAL–AM, a corporation that served as the general partner of Moreno 2 and Riverside 2. Acting through CAL–AM, Laird exercised effective control over the affairs of Moreno 2 and Riverside 2. In addition, Laird owned and/or exercised effective transactional control over various other entities with which Moreno 2 and Riverside 2 became directly or indirectly involved, including CAL–AM, Go Publ., J.E.C., Bio-Sci, and North Coast Financial.

During the latter half of 1974, CAL–AM, as promoter and general partner, established 14 limited partnerships which acquired approximately 350 contiguous acres of unimproved land in Riverside County, Calif. At least 10 of these partnerships, including Riverside 2 and Moreno 2, acquired their tracts of land from Go Publ. on essentially identical terms. Moreno 2 and Riverside 2 each purchased a tract of this land from Go Publ. on December 30, 1974, for $1,008,000 and $126,000, respectively. Just a few days before that, CAL–AM and CAL–AM Financial had acquired the very same parcels of land for $186,000 and $55,000, respectively, and had transferred to property to Go Publ. which, in turn, made the sale to the limited partnerships.

Go Publ. accepted nominal downpayments of less than 1 percent of the putative purchase price from Moreno 2 and Riverside 2, and then "loaned" the balance of said purchase price to the partnerships. These nonrecourse purchase-money loans were secured solely by the tracts themselves.

The loan arrangements between Go Publ. and the partnerships required that Moreno 2 and Riverside 2 make substantial "up front" payments of prepaid interest and loan points. These payments totaled $433,000 in the case of Moreno 2, and $54,125 in the case of Riverside 2.

Moreno 2 and Riverside 2 used partnership contributions to pay the prepaid interest and downpayment. They "paid" points by means of a carefully orchestrated circular exchange of checks. In essence, Go Publ. (the seller) wrote checks in favor of J.E.C., a controlled entity. J.E.C., in turn, wrote checks in favor of the partnerships (the buyers). The partnerships then paid their loan points by completing the circle and writing checks in favor of Go Publ. The aggregate balance of all the entities' bank accounts (i.e., Go Publ., J.E.C., and the partnerships), both before and after the circular exchange of checks, did not come close to

matching the dollar total of the checks written by the partner- ships. Were it not for the near-simultaneous exchange of checks and the resulting pattern of bank debits and credits, the checks written by Go Publ. in favor of J.E.C., by J.E.C. in favor of the partnerships, and by the partnerships back to Go Publ., would have been returned by the banks for insufficient funds.

The debt created by the cashier's checks advanced by Go Publ. to J.E.C. was secured by a nonrecourse promissory note for which no collateral or security was given. In addition, J.E.C.'s "obligation" to pay on this note was made completely contingent upon the 10 aforementioned partnerships' repaying the "funds" advanced to them by J.E.C.

The loans from J.E.C. to the limited partnerships were secured solely by a subordinate deed of trust on the subject properties. Had there been a default, J.E.C. would not have been in a very enviable position since the purchase-money mortgages in favor of Go Publ. covered almost the full extent of the purchase price which was, to petitioners' way of thinking, the fair market value of the property.

Subsequently, in November 1975, Moreno 2 and Riverside 2 each sold its tract of land to Bio-Sci, another Laird-controlled entity, for purported purchase prices of $1,520,000 and $190,000, respectively. Compensation to the limited partnerships took the form of an assumption by Bio-Sci of the obligation to Go Publ. and Bio-Sci's execution of a promissory note for the balance. No payments were made on the notes running between the limited partnerships and Bio-Sci until 1979. Contemporaneously with the sale to Bio-Sci, J.E.C. released its security interest in the respective properties without consideration.

Meanwhile, Laird, through his various entities, went about developing the entire 350-acre tract of land. In 1979, portions of the subject properties previously owned by the two limited partnerships, which had subsequently passed through the hands of other Laird-controlled entities, were sold to presumably independent third parties. At the time of the sale, Go Publ. released its security interest in the subject properties for no consideration. Payments were then made to the two limited partnerships on the notes running between Bio-Sci and the limited partnerships, and cash was distributed to petitioners.

Section 163(a) generally permits cash basis taxpayers, such as the parties of Moreno 2 and Riverside 2, to deduct interest "paid" within the taxable year on "indebtedness." Two lines of inquiry relevant to this case are raised by this statement of the law: (1) Did the arrangement between J.E.C. and the limited partnerships give rise to a bona fide indebtedness sufficient to support an interest deduction; and (2) did the arrangement among Go Publ., the limited partnerships, and J.E.C. result in interest being paid within the purview of section 163? We deal with each in turn.[9]

### Genuine Indebtedness

To be deductible under section 163(a), interest must be paid on genuine indebtedness; that is, indebtedness in substance and not merely in form. *Knetsch v. United States*, 364 U.S. 361 (1960); *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In nonrecourse situations, indebtedness is genuine and has substance only if the value of the underlying security bears a reasonable relationship to the amount of the indebtedness. *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975).

In examining the value of the underlying security—the tracts of property purchased by Riverside 2 and Moreno 2—we are confronted with the obvious fact that properties purchased by CAL–AM Financial and CAL–AM for $55,000 and $186,000 were transferred to, and sold by, Go Publ. to the limited partnerships—less than 1 week later—for $126,000 and $1,008,800, respectively. A sale between related parties at such a dramatic increase in price over a 1-week period is enough, standing alone, to call into question the bona fides of the sales price. In addition to inviting our attention to this obvious fact, respondent has chosen to build his case against petitioners in two other ways: first, respondent has affirmatively demonstrated that those factors cited by petitioners as justification for the price rise just do not support their position; and second, respondent has

[9]We have restricted our analysis to these two statutory requisites and, outside the parameters of the statute, we have not considered, because in our view we need not reach them, such broader doctrines as substance versus form, transaction entered into for profit, or business purpose.

introduced independent expert testimony which confirms the impression created by the just-recited facts that the sales prices to the partnerships were highly exaggerated.

In an effort to show that the price paid by the partnerships in December of 1974 was not unrealistic, petitioners argue that Moreno 2 and Riverside 2 bought not only land, but also an obligation from the general partner (CAL–AM) to develop their property, as well as the rest of the 350-acre site, at no additional cost to the partnerships. The firepower of petitioners' argument has been directed at showing, through proof of the substantial time, money, and energy invested by the general partner and other Laird-related entities in developing the 350-acre site, that such activity reflected the fruits of an obligation which had substantial value at the time the partnerships acquired the properties. Regardless of how much energy the Laird empire devoted to developing this site, however, we are satisfied that there was no binding obligation on the part of the general partner or anyone else to develop the 350-acre tract of land for the benefit of these limited partnerships.

One would expect that an agreement, if one existed, of such seeming importance would be reduced to writing. Logically, it would be contained in the partnership agreements between CAL–AM and the limited partnerships, where the parties have presumably hammered out their rights and obligations. Significantly, however, these partnership agreements contain no promise or commitment whatsoever by CAL–AM to develop the property for the benefit of the limited partnerships, and even more significantly, the agreements state: "This agreement contains the entire Agreement between the parties and supersedes all prior writings or representations."

Undaunted, petitioners offer the following to support the assertion that such an obligation existed: (1) Language in the offering circulars for each partnership; (2) testimony of Laird, petitioner John Beck, and individuals involved with the Laird operation; (3) a letter to Southern California Financial from Laird on behalf of CAL–AM that purportedly describes planned development activities; and (4) the fact that development was subsequently carried out. Apart from the absence of legal significance of these points in view of the actual terms of the partnership agreements, this evidence does not support the assertion that the general partner had made a binding obligation

to develop the property at no additional cost to and for the benefit of the limited partnerships. Although the offering circulars described a program for master planning and development, there is no language of promise, commitment, or contract; the circular, which, as any sort of binding commitment, is stigmatized by sales-type puffery, merely describes a program that could and might be carried out as a means of maximizing return on the investment. The letter to Southern California Financial, dated May 20, 1975, does speak in terms of "an obligation to investors of CAL–AM," but we question the precision with which that term was used since the letter was written in an effort to explain CAL–AM's financial woes to its obligee. In any event, this letter certainly is not probative evidence that such a binding legal obligation existed at any time, more specifically, on the date the partnerships acquired the property.

As to the testimony of petitioners' witnesses, it cannot be said that they are disinterested. Even so, their testimony was not helpful to petitioners' case. On five separate occasions during cross-examination, petitioner John Beck admitted that CAL–AM had made no specific promise to him, as an investor and limited partner, to develop the property. Ken Yates, a key employee of the Laird-controlled entities, also testified that there was no promise made by CAL–AM. Even Laird testified that he did not know whether such a promise to develop was made. More importantly, Laird stated that "basically we looked upon our responsibility as being that contained in the partnership agreement." As previously indicated, the partnership agreements contained no enforceable promise or commitment obliging CAL–AM to develop the property for the benefit of the partnerships.

Finally, although petitioners devote a great deal of time both at trial and on brief to showing that significant development work was not only contemplated from the beginning but was carried out to fruition, we do not find that fact to be particularly relevant. As stated, this work was not done pursuant to any legally enforceable contract or promise running between CAL–AM and the limited partners. To the contrary, the development work was done under the direction and at the discretion of Laird, acting through CAL–AM and other controlled entities.

While the development work nominally benefited the limited partners during that period of time in which the partnerships

owned the property (a period of less than 1 year), the partnerships paid such an inflated price for the land that the development work could not raise the value of the property to that level during such time. The inflated sales price, which carried with it an excessive mortgage on the property, protected Laird from the possibility that any limited partnership would attempt to take advantage of the development activity by refusing to sell the land back to the Laird-controlled entities. Thus, it is quite apparent that Laird was at all times the true beneficiary of this development work.

The question of whether CAL–AM had a binding obligation to perform development work is basically a question of fact. On these facts, we conclude that CAL–AM made no such binding commitment. We are thus left with an unexplained incredible increase in the price of the subject properties in less than a 1-week period of time.

As indicated earlier, respondent did not rest his case solely on the hope of rebutting petitioners' claimed reasons for the dramatic increase in value of the property. Respondent affirmatively established, through the testimony of an expert witness, Ray E. O'Bier, that the price paid by the limited partnerships for the subject properties was far in excess of the fair market value of the properties.

O'Bier, at the time of the trial of this case, had been in the business of making independent real estate appraisals for more than 25 years and had lived and worked in the San Bernardino-Riverside area all his life. O'Bier had a strong real estate background, both from the point of view of training—he held a bachelor's degree and had taken numerous courses in real estate appraisal—and practical experience—he had, on hundreds of occasions, professionally appraised vacant, unimproved land of the sort acquired by the limited partnerships, including recent appraisals within the same general vicinity as the land in issue here. Through his testimony and an extensive appraisal report, O'Bier testified convincingly as to his detailed familiarity with the appraisal business in general and the subject properties in particular.

O'Bier concluded that the total fair market value of the

unimproved vacant lots acquired by Moreno 2 on December 30, 1974, for which Moreno 2 paid $1,800,000, was $270,000.[10] He also concluded that the fair market value of those lots was $270,000 on:

(a) December 26, 1974, when the lots were acquired by CAL–AM from Moreno Properties 3 and Moreno Properties 4;

(b) December 27, 1974, when the lots were sold by CAL–AM to Go Publ.; and

(c) November 1, 1975, when the lots were sold by Moreno 2 to Bio-Sci.

O'Bier concluded that the fair market value of the unimproved lot acquired by Go Publ. on December 30, 1974, and sold to Riverside 2 for $126,000 on that same day was $42,500 and that the fair market value was the same amount on December 23, 1974, when the lot was acquired by CAL–AM Financial for $55,000 from Southern California Financial and on November 1, 1975, when the lot was sold by Riverside 2 to Bio-Sci.

In reaching this conclusion, O'Bier used the market data or comparative approach for valuing the property on the theory that an analysis of comparable sales provides a more accurate picture of the value of vacant and unimproved property than a cost approach or an income approach. He considered sales of comparable properties in a five-block area surrounding the vicinity of the subject properties. The search disclosed some 150 transactions during the years 1970 through 1977 ranging in size from 3 to 4 acres to more than 200 acres. Sales involving improved sites, sales between related entities, and those that, for some other reason, did not meet the test of a true arm's-length

---

[10]Most specifically, O'Bier concluded that the fair market value of the property acquired by Moreno 2 on Dec. 30, 1974 was:

Block 16:
Lot 3 ................................................ $40,500
Lot 4 ................................................ 48,000
Lot 5 ................................................ 30,500
Lot 6 ................................................ 31,500

Block 24:
Lot 3 ................................................ 31,000
Lot 4 ................................................ 30,000
Lot 5 ................................................ 28,500
Lot 6 ................................................ 30,000
                                                          270,000

transaction were discarded. Forty-nine sales, ranging from March 1970 through May 1977, were selected as representative, and, in O'Bier's opinion, the sales presented a clear picture of the level of values in the area of the subject properties for the different valuation dates and were indicative of the volume of market activity at any time in the 7-year period.

O'Bier's investigation was not restricted solely to obtaining information regarding comparable sales transactions. He also contacted various governmental and quasi-governmental agencies to obtain zoning information, building permits, and information regarding utilities; and he also spoke to real estate brokers, investors, and other individuals knowledgeable in the market.

O'Bier observed that during the late 1960's, and extending through 1972, the speculative investment market in this area, which was motivated in part by a large land promotion enterprise, enjoyed substantial economic success. From 1970 until 1972, the market held fairly constant in terms of value with only perhaps a slight downturn toward the end of 1972. At the same time, there were significantly more sales in the study area in 1972 than in the 2 preceding years. Toward the end of 1972, the market took an abrupt downward turn which lasted through the end of 1975 or early 1976. At that time, the market began another rise. More specifically, there was a significant slowdown in the number of sales in 1973 through 1975 which, when coupled with a fall in unit selling prices, was a clear indication of the downward trend.

Based on this analysis, O'Bier reached the following conclusions with respect to the 350-acre tract of land. First, in 1972, those subject parcels comprising relatively flat land lying adjacent to improved street frontages enjoyed unit values ranging from $5,000 to $6,000 per acre, and those parcels away from improved street frontage and those which are characterized by more rolling and undulating terrain enjoyed a basic unit value of $4,000 to $5,000 per acre. Second, by late 1974, there had been a substantial reduction in the value of these properties for reasons previously mentioned. The best parcels, namely those with flat land on improved street frontage, enjoyed unit values from $4,500 to $5,500 per acre. The less desirable lots maintained basic unit values ranging from $3,250 to $3,500 per acre. Third, the decline in market value was such that it was very gradual.

Thus, there would be little difference between a December 1974 and November 1975 value.

Petitioners spent a great deal of time during cross-examination and on brief attacking O'Bier's expertise, methodology, and conclusions. We see no need to rebut each and every one of these observations in lengthy detail.[11] Suffice it to say that even if O'Bier committed some errors in his analysis, none of the errors would be enough to explain the $12,600 per acre purchase price paid by the limited partnerships. Based on O'Bier's testimony, we conclude that the stated purchase price far exceeded the fair market value of the properties.

In an effort to demonstrate that these transactions indeed had economic substance, petitioners have argued that events occurred in years subsequent to 1974 which resulted in Moreno 2 and Riverside 2 (and thus the petitioners) actually receiving cash flow from profits earned on the properties in question. In this regard they point to (1) the allegedly profitable partnership sales of the property to Bio-Sci in November of 1975, (2) the sales of the property once owned by the partnerships, after subdivision, in 1979, (3) subsequent checks disbursed by Bio-Sci to the partnerships in October and December of 1979, and (4) checks distributed by the partnerships to J.E.C. and the partners, also in

---

[11]On brief, petitioners point out some 18 errors allegedly made by O'Bier. They range from a failure by O'Bier to take into account CAL–AM's obligation to develop the property (which, as noted above, legally did not exist), to his failure to talk to the owners and take into account sales of the subject property (easily understandable, since the sales were between related parties), to defects in his understanding of the full extent of plans and use for and work being done on the property in 1977 (respondent has rightly stated that the report concerned the state of the property in 1974 and 1975, not 1977), to his erroneous belief that block 23 had no bridge (the record does not clearly indicate that access to the property could be had over this bridge; in any event, lack of access resulted in only a 20-percent reduction in O'Bier's value), to his lack of familiarity with the property and his use of unacceptable comparables (we view the last observation as plainly wrong).

The only observation by petitioners that may merit more than a short comment is petitioners' complaint that "O'Bier treated each lot as a viable entity unto itself, with no consideration given to the fact that [CAL–AM] own[ed] and control[ed] [the entire 350 acres]." Petitioners' position is that CAL–AM's control of the entire parcel made planning and development easier and cheaper. That may be true, but we are not sure that necessarily means that the limited partnerships should have paid more to acquire their property. O'Bier, for one, countered with his view that diverse ownership probably enhances value because there are more people who can afford to purchase smaller parcels. On this record, there is no basis for concluding that respondent's expert is in error; his is the only expert opinion on the subject. Even if petitioners were correct, there is no basis in the record for selecting any given amount as the correct increase in value. We feel safe in saying, however, that no amount of credible increase would explain the large purchase price paid by the limited partnerships.

October and December of 1979. While these events are fundamentally irrelevant to the issues in this case, which hinge on the value of the property as of December 1974, these sales and cash distributions warrant some comment, if only to rebut the erroneous argument that the partnership distribution to petitioners resulted from "profits" realized on these sales.

In November of 1975, Laird caused Moreno 2 and Riverside 2 to sell their land to Bio-Sci, another Laird-controlled entity, at reported prices of $1,520,000 and $190,000, respectively, which are, of course, substantially in excess of the respective purchase prices of $1,008,000 and $126,000. These sales were for unsecured installment notes and for no cash whatsoever. The partnerships elected the installment method and reported no gain from the sales. Terms of the sales were dictated by Laird, who "negotiated" on behalf of both the buyers and the sellers. In short, these were not arm's-length transfers, and there is no more reason to believe that the sales prices here represented fair market value than was the case in the earlier transactions. Our observation in this regard is bolstered by the testimony of respondent's expert, which we accept, that the sales prices were, once again, many times greater than the fair market value of the land. Whether Bio-Sci actually paid off on the notes was a matter which, for all practical purposes, was left to the discretion of Laird. The "profits" created by the November 1975 sales were mere paper profits, completely lacking in economic substance.

During the years 1975 through 1979, the 350-acre tract underwent substantial development, and during this period, various parcels in the tract, including the subject properties, passed from Bio-Sci through a number of different Laird-controlled entities. By 1979, the land was owned by North Coast Financial, a CAL–AM affiliate wholly owned by Laird. At that time, North Coast Financial sold some of the tract to presumably unrelated buyers, supposedly generating a cash flow payment on the notes held by the limited partnerships which led to the distributions to the petitioners. Based on evidence hereinafter discussed, it is abundantly clear that the cash flow to petitioners was an artificial creation of the promoters which bore no relation to the actual 1979 sales.

The sale which received the most attention from the petitioners and which allegedly generated the cash flow to petitioners in their capacity as limited partners in Riverside 2 was a sale of

Tract No. 6774 on January 4, 1979, by North Coast Financial to unrelated buyers. Tract No. 6774 consists of lots 23–1 and 23–2, which were formerly owned by Riverside 1 and Riverside 2, respectively. The lots stand side-by-side and are of equal size and value. Lot 23–2 was the only property Riverside 2 ever owned.

Petitioners claim that Tract No. 6774 was sold for $418,352. Out of this amount, $250,000 was the value attributed to certain property accepted in exchange by North Coast Financial as part of the sale.[12] This leaves a maximum amount of cash payment of $168,352. At the time of the transaction, Bio-Sci had an outstanding purchase-money security interest in lot 23–2 of $190,000, and Go Publ. had an outstanding purchase-money security interest in lot 23–1 of $105,000. Legal Mortgage Corp. and J.E.C. also held security interests in Tract No. 6774 in the amounts of $40,750 and $83,150, respectively, for which they were never compensated. Obviously, if this were a bona fide arm's-length transaction, these outstanding secured obligations would be paid off before other unsecured obligations were paid. The latter category includes the $65,000 owed by Bio-Sci to Riverside 2 arising out of the 1975 sale of lot 23–1 to Bio-Sci. Obviously, too, this would mean that there would be no cash flow available to Riverside 2 and its limited partners, even if nothing were earmarked for the substantial development and selling costs.

Nevertheless, by the date of trial of this case, Riverside 2 had concluded its activity, distributed all its assets to its partners, and extinguished all its liabilities. On October 10, 1979, Bio-Sci had paid Riverside 2 approximately $65,000, and Riverside 2 had paid petitioners $22,312.50 as the first and final distribution from the partnership. Petitioners' share of the 1979 long-term capital gain reported by Riverside 2 is allegedly $60,800. Due to the fact that Riverside 2 repaid J.E.C.'s loan of $41,625, petitioners received cash in the amount of $22,312.50 in 1979 and, based on their calculation, must recognize capital gain on the full $60,800. Thus, petitioners claim that their original investment of $12,825 in Riverside 2 grew in less than 5 years to the

---

[12]We note that respondent's expert concluded that the actual value of the property exchanged by North Coast Financial was more in the neighborhood of $125,000 to $150,000. The precise value is not, however, particularly relevant to the cash flow analysis.

point where they received back cash of $22,312.50 and recognized a long-term capital gain of $60,800.

The cash flow claimed to have been generated was, in fact, the product of a number of non-arm's-length maneuvers which include the following:

(1) On January 4, 1979 (the day on which Tract No. 6774 was sold), Laird caused Go Publ. to release the security interest Go Publ. obtained in the property when it sold lots 23–1 and 23–2 to Riverside 1 and Riverside 2 in 1974. The underlying purchase-money loans were not paid off.

(2) Laird also caused Legal Mortgage Corp. and Bio-Sci to release their respective security interests on January 4, 1979, for no consideration.

(3) Similarly, J.E.C. had already released its security interest in the property for no consideration in November of 1975. Riverside 1's debt to J.E.C., as of the date of the trial of this case, remained unpaid. Riverside 2 paid J.E.C. $41,625 on October 10, 1979. Given the fact that Riverside 1 never paid J.E.C., we find the eve-of-the-trial timing of Riverside 2's payment to be more than coincidental.

Any doubt we may have had that the cash flow generated for the benefit of the petitioners was something other than an 11th hour pretrial maneuver intended to influence the outcome of this case is eliminated when we examine the records of Riverside 1. The 1979 books and records of Riverside 1 should parallel the records of Riverside 2 in reflecting the receipt of any funds as a result of the sale of Tract No. 6774. In rather dramatic contrast to the 1979 books and records of Riverside 2, which show that the partnership was paid off by Bio-Sci, and also show the partnership liquidating its debt to J.E.C. and making a distribution to the petitioners, the records of Riverside 1 do not show the receipt of any funds as a result of this sale.

The other 1979 sales which led to a cash distribution to petitioners as limited partners in Moreno 2 exhibit a similar pattern. The record only shows how much a given lot or tract brought upon sale after more than 4 years of general market appreciation and after extensive development work. The petitioners have failed to establish that these sales proceeds were sufficient to extinguish existing debt encumbering the properties, much less to cover the costs associated with their development and sale. Thus, we can only conclude that funds were

disbursed shortly before trial, at the direction of Laird, to create the appearance of a profit for Riverside 2 and Moreno 2.

All in all, the record is replete with evidence that the price the limited partnerships paid for the property was inflated and that the amount of so-called indebtedness was far in excess of the fair market value of the property. It follows from this proof that the indebtedness was not bona fide and that the no-interest or points deduction is to be allowed.

### Interest Must Be "Paid"

As we touched upon earlier, there is a second reason, grounded in section 163(a), that the limited partnerships are not entitled to deduct the $374,625 in loan points.

The section 163(a) deduction is allowed for interest "paid," and the payment required to secure a deduction for a cash basis taxpayer is the payment of cash or its equivalent. *Eckert v. Burnet,* 283 U.S. 140 (1931). In this context, a taxpayer's note is not the equivalent of cash. *Helvering v. Price,* 309 U.S. 409 (1940). As phrased by the Supreme Court in a related context, "the note may never be paid and if it is not paid, the taxpayer has parted with nothing more than his promise." *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 578 (1977), quoting *Hart v. Commissioner,* 54 F.2d 848, 852 (1st Cir. 1932). Therefore, the act of simply increasing the principal of a loan by the amount of interest owed does not constitute payment for a cash basis taxpayer. Nor can taxpayers circumvent this rule, as the partnerships here have attempted to do, by the simple expedient of taking transitory possession of loan proceeds originating with the creditor and, as the final step of an integrated transaction, making a prearranged transfer of these funds back to the creditor as an interest payment. See *Rubnitz v. Commissioner,* 67 T.C. 621, 629 (1977).

In the instant case, Moreno 2 and Riverside 2 looked ultimately to the original creditor, Go Publ., for funds to pay the loan points. These funds were generated through "check swapping." That is, between December 26 and 31, 1974, Go Publ. purchased cashier's checks payable to J.E.C., and J.E.C. deposited these checks in its bank account; between December 26 and 30, 1974, J.E.C. purchased cashier's checks payable to the 10 CAL–AM limited partnerships, including Moreno 2 and Riverside 2, and the partnerships deposited these checks to their respective

accounts; and between December 26 and 30, 1974, the limited partnerships wrote checks payable to Go Publ. for the amount of the interest points. Go Publ. did not have the funds in the bank account it opened on December 24, 1974 (with a $100 deposit), with which to pay back the $1,542,500 it purchased in cashier's checks; J.E.C. wrote $1,540,500 in checks to the limited partnerships on the strength of the cashier's checks from Go Publ.; and the limited partnerships wrote their checks for points on the strength of the J.E.C. cashier's checks. The bottom line is that the partnerships had grossly insufficient funds to support the payments for points. And Go Publ. was able to pay off the certified checks only from a fleeting bank balance created by a deposit of the proceeds of the checks themselves—masquerading as cash payment of points.

*United States v. Clardy*, 612 F.2d 1139 (9th Cir. 1980), is a case affirming a criminal conviction for assisting, etc., in the preparation and filing of false and fraudulent income tax returns. The fact pattern, which is ominously similar to that of the case before us, involved transactions in which three different taxpayers purchased property from entities controlled by one John D. Clardy (also the return preparer) for an inflated purchase price. The taxpayers paid for the property through nonrecourse financing and were also required to make large prepayments of interest. Three variations on the same theme were employed to create the purported prepaid interest payments. For Johnson, Clardy simply drew two $65,000 checks on a trust bank account for the supposed seller, Cougar Construction. Both checks, with the active cooperation of a friendly bank, were payable to and deposited back in that same trust bank account. One check, which represented the purported interest payment, bore the legend "Johnson—Prepaid interest on Green Valley Road contract"; the other bore the legend "Loan from Cougar Construction." In the case of Ririe, he wrote a check for $16,020 on his personal bank account, and when the seller received that check, the seller drew its check for $16,020 payable to Ririe as a loan to prepay the interest. The pretended payment of prepaid interest by Mobley involved more checks and more bank accounts, but the thrust of the transaction was the same. In essence, the so-called loan providing funds for the interest payment was made from a fictitious bank balance created by a deposit of the interest itself.

The Court of Appeals experienced "no hesitation" in concluding that a scheme which involved swapping offsetting checks and required the cooperation of a friendly bank to get the checks entered as debits on the relevant bank accounts would not support an interest deduction. Accord, *Battelstein v. Commissioner*, 611 F.2d 1033 (5th Cir. 1980).

The instant case fits within the *Clardy* mold. The payment construct between Go Publ., J.E.C., and the limited partnerships was nothing more than an illusory facade constructed by means of check swapping. There was no payment of interest here because no money nor bankable funds were employed or were even available. To paraphrase the Ninth Circuit in *Clardy*, since no financial resources were required, there was no limit to the amount that could be paid using this technique: $3 million could have been paid as easily as the approximately $300,000 that was paid. *United States v. Clardy*, 612 F.2d at 1152. The section 163(a) payment provision requires substantially greater substance and reality than either the facts of *Clardy* or this case demonstrate.

Petitioners seek to distinguish *Clardy* on the ground that the so-called loan to the limited partnerships in the instant case was drawn on the checking account of J.E.C. rather than that of the original creditor, Go Publ. Although interest paid out of money borrowed from an independent third party is ordinarily deductible (see *McAdams v. Commissioner*, 15 T.C. 231, 235 (1950)), we have little trouble in concluding that *McAdams* offers no help to petitioners for the simple reason that the sole purpose served by J.E.C. was to act as a pipeline for the transmission of funds. The lack of substance to J.E.C.'s role is highlighted by the fact that J.E.C.'s obligation to make payments on the money it borrowed from Go Publ. was completely contingent upon its collection of funds loaned to the limited partners and the fact that there was no real security for these loans, since, even under petitioners' view of the case, the nominal downpayment meant that the purchase-money nonrecourse loans ate up almost the entire amount of the supposed value of the property.

Neither does a case such as *Burgess v. Commissioner*, 8 T.C. 47 (1947), support petitioners' position. There, the taxpayer was permitted to deduct interest paid even though the interest was paid in substantial part out of funds borrowed from the original creditor. See also *Burck v. Commissioner*, 63 T.C. 556 (1975),

affd. on other grounds 533 F.2d 768 (2d Cir. 1976); *Wilkerson v. Commissioner,* 70 T.C. 240 (1978).[13]

In *Burgess,* a taxpayer who initially borrowed from a creditor approximately $200,000, later borrowed an additional $4,000 from the same creditor, adding that sum to his checking account balance of $3,180.79. Several days after that, he drew a check for $4,219.33 to cover the interest on both the initial principal and his $4,000 additional loan. The Government argued that the taxpayer had paid the interest "by giving a note which remained unpaid at the end of the year and constituted an addition to the original debt."

The Court allowed the interest deduction in *Burgess* because the $4,000 was obtained to pay several bills in addition to the interest and because the loan proceeds were commingled with the taxpayer's other funds. We held that these two factors were a reflection of the taxpayer's ability, both in a practical economic sense and in a legal sense, to exercise independent dominion and control over the loan proceeds. Thus, there was an element of economic substance which distinguishes the *Burgess* case from the instant case.

Here, the limited partnerships did not have any control over the loan proceeds, nor can it be said that the loan proceeds were commingled with other funds in the bank accounts of the limited partnerships for the simple reason that, in actuality, there were no loan proceeds.

We therefore conclude that there was no payment of points which can be deducted as interest by the petitioners within the meaning of section 163(a).

*Decision will be entered under Rule 155.*

---

[13]We note that the *Burgess* exception has been the subject of some criticism. See *Battelstein v. Commissioner,* 611 F.2d 1033 (5th Cir. 1980); *Burck v. Commissioner,* 533 F.2d 768, 770 n. 3 (2d Cir. 1976); *Goodstein v. Commissioner,* 267 F.2d 127, 131 (1st Cir. 1959); *Burgess v. Commissioner,* 8 T.C. 47, 50–51 (1947) (Judge Kern dissenting for himself and five other Tax Court judges).