WOLVERINE, LTD., SHELDON M. SISSON, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, AND WOODCHUCK, LTD., SHELDON M. SISSON, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
WOLVERINE, LTD. v. COMMISSIONER
Docket No. 26539-90
United States Tax Court
T.C. Memo 1992-669; 1992 Tax Ct. Memo LEXIS 709; 64 T.C.M. (CCH) 1342; November 19, 1992, Filed Decision will be entered for Respondent. For Sheldon M. Sisson, pro se. For Respondent: Victor A. Ramirez. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent issued Notices of Final Partnership Administrative Adjustment (FPAA) for 1983 for two partnerships: Wolverine, Ltd. (Wolverine), and Woodchuck, Ltd. (Woodchuck). On November 26, 1990, petitioner filed a Petition for Readjustment of Partnership Items Under Code Section 6226. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1983, and all Rule references are to the Tax Court Rules of Practice and Procedure. The Wolverine and Woodchuck partnerships merged on December 31, 1983; the surviving partnership was Woodchuck. For 1983, Wolverine and Woodchuck filed separate tax returns, and separate FPAAs were issued for each partnership. In this opinion, Wolverine and Woodchuck will be treated as separate partnerships. Throughout this opinion, there are discussions of the evidence presented by petitioner for the Woodchuck partnership transactions; documentation for the Wolverine transactions was not presented at trial. The issues *710 for decision are: (1) Whether an extension of the period of limitations was executed by respondent prior to the expiration of the period of limitations; (2) whether there exists a 1983 settlement agreement that is binding between respondent and petitioner; and (3) whether the partnerships' transactions have economic substance to support interest and maintenance expense deductions claimed on the partnership returns for 1983. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated herein by this reference. Petitioner resided in Tarzana, California, at the time he filed his petition. The limited partnerships, Woodchuck and Wolverine, were formed under the laws of California on August 30, 1982. Gerald L. Schulman (Schulman) was the general partner and Sheldon M. Sisson (petitioner) was a limited partner of Woodchuck and Wolverine in 1983. Woodchuck and Wolverine are two of hundreds of similarly structured limited partnerships organized, promoted, and syndicated by Schulman. Schulman was the general partner of each limited partnership. The Schulman partnerships were formed for the express purpose of acquiring buildings under lease to *711 Government entities or utility companies. Schulman promoted the limited partnerships by representing, inter alia, that each partnership would claim an interest deduction in its first year substantially equal to the partners' cash capital contributions. Each first-year interest deduction was actually based upon a circular transfer of funds. The interest was purportedly paid on an unsecured note (short-term note) to a Schulman partnership from a Netherlands or Netherlands Antilles corporation, which amount was purportedly reloaned by that partnership, unsecured and interest free, to a Panamanian corporation. In return for the "interest free deposit", the Panamanian entity would locate a building leased by a Government agency and sell that building to the partnership with favorable long-term financing (long-term note) for the purchase. Petitioner contributed $ 121,010 for a limited partnership interest in Woodchuck and $ 96,790 for a limited partnership interest in Wolverine. The offering memorandum for the Woodchuck partnership stated that the partnership would acquire property including a building leased to the U.S. Government. The memorandum indicated that the Woodchuck partnership *712 would acquire the property for $ 9,000,000, using a 30-year, 9-percent self-liquidating nonrecourse promissory note. On December 1, 1982, Schulman, as general partner of Woodchuck, signed a one-page promissory note to borrow $ 11,175,000 from Alquan Finance Company, B.V. (Alquan), at a 12-percent interest rate. The loan agreement was not signed by a representative of Alquan. Wolverine's 1983 partnership return indicated that $ 8,940,000 was borrowed for that partnership. The total of these two short-term notes is $ 20,115,000. On March 18, 1983, Woodchuck executed with Inversiones Arena Mar, S.A., a Panamanian corporation, an Agreement to Provide Real Property and Financing. The Woodchuck offering memorandum explained the purpose of entering into this financing agreement as follows: In return for this property and financing commitment, the Partnership was obligated to and did deposit on December 1, 1982, the sum of $ 20,115,000 with Inversiones for a term of thirteen (13) months. No later than December 31, 1983, Inversiones is obligated to return the deposit to the Partnership without interest. In order to make said deposit, on December 1, 1982, the Partnership borrowed *713 the sum of $ 20,115,000 from Alquan Finance Co. ("Alquan") at an annual rate of twelve percent (12%). The Partnership will repay the principal of the loan when the deposit is returned by Inversiones. The entire sum of the capital contributions made by the Limited Partners will be used to pay (i) interest on the loan from Alquan and (ii) currently due maintenance and insurance expenses of the property. * * *
During 1982 and 1983, Woodchuck sold 33 limited partnership interests, raising capital contributions of $ 2,700,000. Effective August 22, 1983, Schulman and the Internal Revenue Service (IRS) entered into a Settlement Plan Agreement (Settlement Plan), setting forth concepts upon which formal settlement agreements would be drafted for Schulman's individual tax returns for 1976 through 1983. Although the Settlement Plan was negotiated on the basis of Schulman's tax returns, the plan was to affect settlements offered to other investors in Schulman partnerships. The Settlement Plan included the following: 2.5 This document is intended to be an agreement in principle establishing the concepts upon which a formal settlement agreement will be drafted. * * * * * * Subject *714 to the terms and conditions herein, the parties hereto agree as follows: 3.1 IRS shall allow each investor to deduct seventy percent (70%) of the claimed Investor First Year Deduction. No adjustment shall be made to Additional Investor First Year Deduction. The disallowed portion of the Investor First Year Deduction [thirty percent (30%)] shall be deducted by each investor ratably over the term of the SCHULMAN Partnership Long Term Notes * * * * * * * * * This Settlement Plan Agreement is intended to be used for settlement purposes only and both IRS and SCHULMAN agree that the Agreement, discussions held prior to and in connection with the Agreement, and all schedules and materials previously submitted by SCHULMAN to the Appeals Office (before the date of the execution of this Agreement) in connection with the settlement discussions shall not be used in any manner whatsoever in any administrative or court proceeding. * * * * * * IRS and SCHULMAN agree to exercise the utmost good faith in attempting to settle and resolve the matters described in this Agreement and to execute such documents as are reasonably required to complete Phase II of the settlement plan.
Petitioner *715 was legal counsel for Schulman as well as a limited partner in Wolverine and Woodchuck. On August 23, 1983, petitioner sent a letter to Schulman regarding the Settlement Plan Agreement as follows: "It is my understanding that for 1983 the deductions to be claimed by the partnerships, which are the subject of this letter, will conform to the principles of the agreement for 1977-1982 and it is anticipated that this agreement will be applied by the Internal Revenue Service to 1983." After the Settlement Plan with Schulman was signed and on September 6, 1983, Miramar Investments negotiated for the purchase of real property located at 160 E. 7th Street, Chester, Pennsylvania (the Chester property), for $ 4,210,000 from Boyd C. Wagner (Wagner). The property was already leased to the General Services Administration (GSA) under a noncancelable 20-year lease with one 10-year renewal option. During the negotiations with Wagner, Miramar Investments was represented by Schulman and by Philip November (November), vice president of Miramar Investments. November was an agent of Schulman. On December 23, 1983, Woodchuck entered into a nonrecourse installment-purchase agreement with Miramar Investments *716 to acquire the Chester property for $ 9,000,000. The price was payable over 30 years at an interest rate of 9 percent. The agreement was signed by November and Schulman. On December 30, 1983, the sale of the Chester property was completed between Wagner and Miramar Investments and, on that same date, the GSA lease was assigned to Miramar Investments. On December 31, 1983, Woodchuck merged with Wolverine; the surviving partnership was Woodchuck. Woodchuck retained the same assets, capital structure, debts, and limited partners as Wolverine. On an unspecified date, Schulman signed an agreement for Woodchuck to pay $ 33,075 to Postal Management Services Company for management services and for obtaining insurance. Schulman was sole proprietor of Postal Management Services Company. Schulman signed both as general partner of Woodchuck and on behalf of Postal Management Services Company; there were no other signatures on the agreement. The building was insured against fire and other damage. Woodchuck's 1983 partnership return listed $ 33,075 as maintenance and insurance expense; Wolverine's return listed $ 26,460 for those items. Woodchuck's Form 1065 "Partnership Return of Income" *717 for 1983, dated April 11, 1984, was received by the IRS Fresno Service Center on April 18, 1984. (A copy of Wolverine's Form 1065, stipulated as a joint exhibit, was neither dated by petitioner nor date stamped by the IRS.) The following deductions were itemized on the 1983 partnership returns: Partnership
Note Payable
Interest Expense
Woodchuck
$ 11,175,000
$ 1,016,925
Wolverine
8,940,000
813,540
Schulman, as the tax matters partner, signed and date stamped respective Forms 872-0 "Special Consent to Extend the Time to Assess Tax Attributable to Items of a Partnership" for Woodchuck and Wolverine on November 4, 1986. Stanley S. C. Kong (Kong), an agent for the IRS, signed and manually dated the same forms on November 20, 1986. Approximately 200 Forms 872-0 were signed and dated by Schulman and Kong in this manner. The forms were signed prior to the expiration of the period of limitations; however, copies of these completed forms were not mailed to petitioner until requested by petitioner, which was sometime after April 15, 1987. OPINION Statute of Limitations
Petitioner asserts that the statute of limitations bars the assessment of tax on partnership *718 income for 1983. Section 6229(a) sets out the applicable period of limitations as follows: (a) General Rule. -- Except as otherwise provided in this section, the period for assessing any tax imposed by subtitle A [applicable here] with respect to any person which is attributable to any partnership item (or affected item) for a partnership taxable year shall not expire before the date which is 3 years after the later of -- (1) the date on which the partnership return for such taxable year was filed, or (2) the last day for filing such return for such year (determined without regard to extensions).
Section 6229(b) allows the period of limitations to be extended as follows: The period described in subsection (a) (including an extension period under this subsection) may be extended -- (A) with respect to any partner, by an agreement entered into by the Secretary and such partner, and (B) with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner (or any other person authorized by the partnership in writing to enter into such an agreement),
before the expiration of such period.
Section 7502 defines the method *719 for determining when a partnership return was filed as follows: SEC. 7502. TIMELY MAILING TREATED AS TIMELY FILING AND PAYING. (a) General Rule. -- (1) Date of Delivery. -- If any return * * * required to be filed, or any payment required to be made, within a prescribed period or on or before a prescribed date under authority of any provision of the internal revenue laws is, after such period or such date, delivered by United States mail to the agency, officer, or office with which such return * * * is required to be filed, or to which such payment is required to be made, the date of the United States postmark stamped on the cover in which such return * * * is mailed shall be deemed to be the date of delivery or the date of payment, as the case may be. (2) Mailing Requirements. -- This subsection shall apply only if -- (A) the postmark date falls within the prescribed period or on or before the prescribed date -- (i) for the filing (including any extension granted for such filing) of the return * * *
* * * (B) [and] the return * * * or payment was, within the time prescribed in subparagraph (A), deposited in the mail in the United States in an envelope or other *720 appropriate wrapper, postage prepaid, properly addressed to the agency, officer, or office with which the return * * * is required to be filed, or to which such payment is required to be made.
The expiration of the period of limitations on assessment is an affirmative defense, and the party raising it must specifically plead it and carry the burden of proving its applicability. Rules 39, 142(a); Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227, 240-241 (1990). To establish this defense, the taxpayer must make a prima facie case establishing the filing of the partnership return, the expiration of the statutory period, and the mailing of the notice after the running of the period. Id.
In this case, the actual dates of filing of the partnership returns are not established in the record. For Woodchuck, the return was due April 15, 1984, dated April 11, 1984, and received by the IRS on April 18, 1984. Petitioner testified that both returns were filed by the due date. In any event, the earliest date on which the period of limitations would run was April 15, 1987. Each of the Forms 872-0 in the record bears November 4, 1986, as the date *721 of execution by Schulman and November 20, 1986, as the date of execution by Kong for the IRS. Petitioner claims that Kong could not have executed the forms on November 20, 1986, because it is unlikely that, on that day, Kong manually signed and dated Woodchuck's and Wolverine's extensions and approximately 200 other extensions. Kong testified at trial that he signed the agreements on the date they bear. Kong was a credible witness, his testimony was uncontradicted and unimpeached, and we have no reason to reject it. We have, therefore, found as a fact that the Forms 872-O were signed on November 20, 1986, within 3 years of the date the returns were due, as is required by section 6229(b). Additionally, petitioner asserts that the extension agreements for Wolverine and Woodchuck are invalid because, regardless of timely execution, they were not transmitted by respondent to petitioner until the period of the statute of limitations had expired. There is no requirement that a copy of the extensions be forwarded to petitioner after execution by respondent. See Findlay v. Commissioner, 39 T.C. 580, 587-588 (1962), affd. and revd. on other issues 332 F.2d 620 (2d Cir. 1964); *722 Holtsinger, Inc. v. Commissioner, T.C. Memo. 1986-282. The statute of limitations does not bar assessments in this case. Settlement Plan Agreement
Petitioner also argues that a settlement agreement for the year ended December 31, 1983, was entered into and should be binding on respondent. Petitioner bases his claim on a preliminary Settlement Plan Agreement signed by the IRS and by the general partner, Schulman, on August 22, 1983. First, petitioner argues that section 7121 allows such agreements to be entered into and that the Statement of Procedural Rules, 26 C.F.R. sec. 601.202 (1992), allows such settlements to be entered into prospectively. Second, in his reply brief, petitioner argues that the 1983 Settlement Plan Agreement should be enforced against the IRS by estoppel. Section 7121 provides authority for the IRS to enter into closing agreements "with any person relating to the liability of such person". The Settlement Plan was signed by Schulman and by the IRS prior to the time that the Woodchuck and Wolverine partnerships began operations. It is not a closing agreement in form or effect. See Estate of Magarian v. Commissioner, 97 T.C. 1, 4-6 (1991); *723 Zaentz v. Commissioner, 90 T.C. 753, 760-762 (1988). Respondent contends, and we agree, that petitioner was not offered and did not accept a specific settlement. The agreement between the IRS and Schulman was not a final settlement. The Settlement Plan Agreement was a conditional and precursory agreement between Schulman and the IRS. The agreement stated: "This Settlement Plan Agreement is intended to be used for settlement purposes only and both IRS and SCHULMAN agree that the Agreement * * * shall not be used in any manner whatsoever in any administrative or court proceeding." In Klein v. Commissioner, 899 F.2d 1149 (11th Cir. 1990), affg. an unpublished Tax Court order, the court held that a binding settlement between the taxpayer and the IRS did not exist where the IRS had sent the taxpayer two letters, one of which was a "conditional offer of settlement which would become binding upon the execution of another document, a closing agreement" and the other of which did "not meet any of the requirements set forth in the statutes governing settlement of tax disputes." Id. at 1153. The *724 court found that "these letters do not form a valid binding agreement under the tax code." Id.
In Sergy v. Commissioner, T.C. Memo. 1990-442, the IRS sent to the taxpayers pro forma closing agreements that the taxpayers signed and returned to the IRS; this Court held that the IRS was not bound to the terms of a settlement agreement because the taxpayers knew at the time of their signing that the agreement might be altered at a later date. This Court did "not believe that there was a complete meeting of the minds as to all details of the settlement." Id.
In Nelson Bros., Inc. v. Commissioner, T.C. Memo. 1991-52, counsel for respondent stipulated at trial to a settlement for 1980 and 1981, the years that were before the Court. Counsel also indicated that the same issues were pending for 1982 through 1985. Also at trial, counsel stated that he would settle 1982 and 1983 on the same basis as the 1980 and 1981 settlement and that he would suggest to the examination division to use that settlement in their examination of 1984 and 1985. In a subsequent proceeding before this Court, we held that the original settlement *725 applied only to the years before the Court at the time the settlement was entered into, 1980 and 1981. We stated: While the parties may have intended to be bound by the Settlement with respect to recurring issues in the years 1982 and 1983, the Settlement terms were incomplete and indefinite with respect to the issues in those years. Therefore, we conclude that the parties are not bound by the Settlement with respect to the issues in the years 1982 and 1983. With respect to the issues in the years 1984 and 1985, the testimony of * * * [the taxpayer] indicates that he was aware that respondent's counsel did not have the authority to bind respondent with respect to the years 1984 and 1985 and could only recommend that the Examination Division apply the Settlement to the issues in those years. * * * [Id.]
The foregoing cases are simply examples of many in which preliminary settlement negotiations failed to lead to a binding agreement. There is no basis here for reaching a different result. Petitioner's second argument is that the Settlement Plan that was signed in August 1983 should be enforced by this Court under the doctrine of estoppel. This Court has stated that: *726 the doctrine of equitable estoppel is applied against the Government "with the utmost caution and restraint." See Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977), and cases cited thereat. * * * A key condition is detrimental reliance by the party claiming the benefit of the doctrine on the action of the Government. See Hudock v. Commissioner, 65 T.C. 351, 363 (1975). * * * [Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987).]
Thus, estoppel requires a finding that a claimant relied on the Government's representations and suffered a detriment because of that reliance. Schuster v. Commissioner, 312 F.2d 311 (9th Cir. 1962), affg. 32 T.C. 998 (1959), revg. First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959); Boulez v. Commissioner, 76 T.C. 209 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987); Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); *727 Underwood v. Commissioner, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Boyd v. Commissioner, T.C. Memo. 1992-626. Boulez v. Commissioner, supra, involved an oral agreement with an IRS agent that notices of deficiency would not be issued if the taxpayer, a renowned conductor and composer, would amend his income tax returns so as to treat amounts paid to his agent/corporation as payments made directly to the taxpayer. Based on the revenue agent's representations, the taxpayer amended his returns in that fashion and also assumed a liability previously held by the agent/corporation. The IRS agent did not have authority to bind the IRS, and this Court refused to use the doctrine of equitable estoppel to bind the IRS to its agent's statement under those facts. The Court stated: The mere fact that petitioner included amounts in his gross income and paid taxes thereon which he might otherwise have not so included or so paid is not, in our opinion, a sufficient detriment to warrant the application of equitable estoppel. * * * [Id. at 215.] *728 Petitioner claims that the agreement in Boulez would have been binding if it had been in writing. We disagree; that a settlement agreement be in writing is not the only requirement for it to be binding on the IRS. See Botany Worsted Mills v. United States, 278 U.S. 282, 288-289 (1929); Estate of Jones v. Commissioner, 795 F.2d 566, 572 (6th Cir. 1986), affg. T.C. Memo. 1984-53; Gardner v. Commissioner, 75 T.C. 475, 479 (1980). In any event, the presence or absence of a writing is not a controlling factor in determining whether estoppel is appropriate. Petitioner's only asserted reliance here was that Woodchuck and Wolverine entered into circular short-term lending transactions and claimed 70 percent of the interest as deductions on the partnerships' returns. Those deductions must be sustained, if at all, on the merits. See Davis v. Commissioner, 65 T.C. 1014, 1022 (1976); Avers v. Commissioner, T.C. Memo. 1988-176. Claiming a particular tax position over another option is not a cognizable *729 detriment justifying estoppel against the Government. Boulez v. Commissioner, supra at 215. Economic Substance
Petitioner argues that all money runs in a circle and, thus, that circular short-term loan transactions with foreign entities should be recognized by this Court. Petitioner contends that $ 9,000,000 is the fair market value of the Chester property purchased by Woodchuck and Wolverine. Finally, petitioner argues that the partnerships were consummated for profit reasons and not solely to generate tax deductions. For 1983, the reported losses for Wolverine and Woodchuck were attributable only to deductions for interest and maintenance expenses. The transactions between the partnerships and foreign entities account for all of the interest expense claimed by the partnerships. Because there are no depreciation deductions for 1983, the year in issue in this case, petitioner's fair market value argument is relevant only to ascertaining whether there was economic substance in the transaction between Miramar Investments and Woodchuck. The economic reality of a transaction, rather than the form in which it is cast, governs for Federal *730 tax purposes. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Gregory v. Helvering, 293 U.S. 465 (1935); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). A transaction entered into solely to generate tax benefits, with no other economic or commercial objective to support it, is given no effect for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Knetsch v. United States, 364 U.S. 361 (1960). Petitioner relies on Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), which states that an economic transaction will be recognized where the purchase price of real property is approximately equal to its fair market value. Estate of Franklin involved the deductibility of interest and depreciation claimed with respect to a motel purchased by a limited partnership. The partnership agreed to purchase the motel for $ 1,224,000 and lease it back to the sellers. This purchase price was to be paid *731 under a 10-year nonrecourse obligation requiring $ 75,000 in prepaid interest at the time of the sale, monthly installments of principal and interest approximately equal to monthly rent due under a lease, and a balloon payment at the end of the 10-year period. No cash was to change hands until the balloon payment. The Court of Appeals stated: An acquisition such as that of * * * [the taxpayers] if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale. No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. * * * [544 F.2d at 1048.]
With respect to interest deductions in Estate of Franklin, the court stated that the absence of personal liability alone does not deprive debt of *732 its bona fide character; interest deductions are not recognized "when it appears that the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged." Id. at 1049. The economic substance analysis in Estate of Franklin has been adopted by this Court and by the Court of Appeals for the Ninth Circuit in a number of cases involving real estate transactions, including: Beck v. Commissioner, 678 F.2d 818, 819, 821 (9th Cir. 1982), affg. 74 T.C. 1534 (1980); Marine v. Commissioner, 92 T.C. 958 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Hulter v. Commissioner, 91 T.C. 371, 390 (1988); Odend'hal v. Commissioner, 80 T.C. 588 (1983), affd. and remanded on other issues 748 F.2d 908 (4th Cir. 1984); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); *733 Karme v. Commissioner, 73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. without published opinion 937 F.2d 612 (9th Cir. 1991). In each case, the deciding factor is whether the transaction was a genuine multiparty transaction with economic substance; the courts disallowed deductions for partnership losses that resulted from depreciation and interest expense if the real estate transactions did not have economic substance. The cases of Karme and Marine involved facts indistinguishable from those in this case (although the evidence in this case contained many gaps). In each of these partnerships, the circular transfer of funds using foreign entities to generate interest deductions for limited partnerships was based on a system created by Harry Margolis and pursued by Schulman with the assistance of petitioner. See United States v. Schulman, 817 F.2d 1355, 1357 (9th Cir. 1987); Marine v. Commissioner, 92 T.C. at 962, 969. [1] Petitioner has *734 failed to show any factual difference between this case and the Marine case. Although some of the legal arguments made differ, the economic substance issue is the same. *735 In this case, the main components of Wolverine's and Woodchuck's losses for 1983 are the large interest deductions taken for short-term loans from a foreign entity, Alquan. According to petitioner, the short-term loans were payable at 12-percent interest over 13 months, and the interest deductions were calculated as follows: Partnership
Loan Amount
x Interest
x 70%
Deduction
Woodchuck
$ 11,175,000
x 13%
x 70%
$ 1,016,925
Wolverine
8,940,000
x 13%
x 70%
813,540
No explanation has been given for using a 13-percent rate rather than a 12-percent rate. Petitioner deducted only 70 percent of the total interest purportedly due based on the previously discussed Settlement Plan Agreement that petitioner asserts applied to the partnerships. Here, according to the Woodchuck offering memorandum, the short-term transactions were required so that the Panamanian corporation, Inversiones, which received an interest-free loan, would arrange for the acquisition and long-term financing of property leased to Federal, State, or local governments. The only evidence of the short-term notes is a one-page promissory note for $ 11,175,000 signed by Schulman on behalf of Woodchuck *736 and not signed, or even acknowledged, by any individual on behalf of Alquan. There is no copy of a loan agreement between Woodchuck and Inversiones, and there are no copies of any loan agreements for Wolverine. The long-term debt was financed by Miramar Investments. Petitioner has shown no connection between Inversiones, which received the interest-free loan, and Miramar Investments, which sold and financed the Chester property to the partnerships. None of the interest deductions for 1983 represent the interest for the long-term notes but, rather, represent only the interest for the short-term notes to foreign entities. We discuss both the long-term and the short-term notes because petitioner claims that they are dependent on one another. Using the analysis from the previously discussed Estate of Franklin case, petitioner's claim that the $ 20,115,000 short-term notes and resulting interest deductions were necessary to secure the $ 9,000,000 financing is without merit. Petitioner asserts that the fair market value of the Chester property was $ 9,000,000 on the date of acquisition. Respondent introduced evidence that the value was $ 4,210,000. The Chester property was *737 purchased at arm's length from Wagner for $ 4,210,000 by Miramar Investments and sold, less than 4 months later, by Miramar Investments to Woodchuck for $ 9,000,000, more than twice the arm's-length price, under the nonrecourse installment note. The offering memorandum for Woodchuck determined, before the Chester property was even located for purchase, that the purchase price to the partnership would be $ 9,000,000. The $ 9 million December sales price was set by an installment agreement signed by November, vice president of Miramar Investments, and by Schulman, general partner of Woodchuck. November was associated with Schulman at that time. There is no other evidence supporting this claimed value. Marine involved the purchase by two Schulman partnerships of post offices at greatly inflated prices. We applied well-recognized principles on the valuation of real estate as follows: Fair market value has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973). *738 This generally accepted definition of fair market value assumes that buyer and seller are separate and distinct entities having adverse economic interests. Narver v. Commissioner, 75 T.C. 53, 96 (1980), affd. 670 F.2d 855 (9th Cir. 1982). Applying these principles to the case at hand, the prices at which the partnerships purchased the post offices are not persuasive evidence of fair market value because Schulman controlled both sides of the transactions. * * * [Id. at 982.]
Petitioner's contention that it was necessary to lend $ 20 million interest free in order to secure property at $ 5 million over its fair market value is untenable. We conclude that both the short-term circular loans and the long-term nonrecourse loans lack economic substance and that the partnership loan transactions were motivated by anticipated tax deductions and nothing more. The interest deductions relating to the short-term circular transactions were properly disallowed. Finally, petitioner disputes respondent's disallowance of the maintenance and insurance expenses for Woodchuck and Wolverine. Petitioner asserts that the expenses were *739 supported by a maintenance and insurance contract that was introduced into evidence by petitioner. That contract provided that Postal Management Services Company, owned and managed by Schulman, would be paid $ 33,075 by Woodchuck as compensation for maintenance services and for obtaining insurance on the Chester property. (No contract involving Wolverine is in the record.) The Woodchuck agreement was signed by Schulman, as owner of Woodchuck, and by Schulman, as manager of Postal Management Services Company. No other evidence justifying the expenses was presented. This document standing alone is not sufficient evidence to support the expense deductions on the 1983 tax return. For the foregoing reasons, Decision will be entered for respondent. Footnotes
1. Petitioner was a witness in the case of Marine v. Commissioner, 92 T.C. 958 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991). He has made various accusations against the persons involved in trial of that case, including the Court, that are unsubstantiated and that will not be repeated here. It is notable, however, that his complaints against the Court, raised during the proceedings in these cases, arose out of his failure to be prepared to proceed to trial in other cases involving the Schulman transactions, Gillman v. Commissioner, docket Nos. 21948-85 and 2151-88, and Phillips v. Commissioner, docket No. 112-88. These cases were set for trial during the same session as the Marine case but were ultimately settled. Petitioner's attacks on one of the counsel for the taxpayers in Marine are based on that counsel's former representation of respondent. We can draw no inference from this fact. Prior to his work with the Harry Margolis system and with Schulman, petitioner represented respondent in at least one case in which Margolis represented a taxpayer. See Estate of Cole v. Commissioner, T.C. Memo. 1973-74↩.